202 P.3d 642

**Gerald Ross PIZZUTO, Jr.,
Petitioner–Appellant,**

v.

**STATE of Idaho, Respondent.**

No. 32679.

Supreme Court of Idaho,
Boise, September 2007 Term

Feb. 22, 2008.

Rehearing Denied March 19, 2008.

Federal Defenders Services of Idaho, Moscow, for appellant. Joan M. Fisher argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent. L. LaMont Anderson argued.

## SUBSTITUTE OPINION

### THE COURT'S PRIOR OPINION DATED NOVEMBER 23, 2007 IS HEREBY WITHDRAWN.

EISMANN, Chief Justice.

The petitioner was convicted of two murders and sentenced to death. In this case,

he filed his fifth petition for post-conviction relief, challenging his death sentence on the ground that he was mentally retarded. The district court dismissed his petition on summary judgment, holding that the petition was untimely and that the petitioner did not present evidence creating a genuine issue of material fact as to his mental retardation. The petitioner appealed, and we affirm.

## I. FACTS AND PROCEDURAL HISTORY

On July 25, 1985, the petitioner Gerald R. Pizzuto, Jr., (Pizzuto) murdered two innocent strangers, Berta Herndon and her nephew Del Herndon. Pizzuto approached them with a .22 caliber rifle as they arrived at their mountain cabin and made them enter the cabin. While inside, he tied the Herdons' wrists behind their backs and bound their legs in order to steal their money. Some time later, he bludgeoned Berta Herndon to death with hammer blows to her head and killed Del Herndon by bludgeoning him in the head with a hammer and shooting him between the eyes. Pizzuto murdered the Herdons just for the sake of killing and subsequently joked and bragged about the killings to his associates.

A jury convicted Pizzuto of two counts of murder in the first degree, two counts of felony murder, one count of robbery, and one count of grand theft. In 1986, the district judge sentenced Pizzuto to fourteen years fixed for the grand theft, to a fixed life sentence for the robbery, and to death for the murders. On appeal this Court affirmed Pizzuto's convictions and his sentences, with the exception of his sentence for robbery. We held that the robbery was a lesser included offense of the felony murder, and therefore vacated the fixed life sentence. *State v. Pizzuto*, 119 Idaho 742, 810 P.2d 680 (1991). Within forty-two days after entry of the judgment imposing the death sentence, Pizzuto also filed his first petition for post-conviction relief. The trial judge denied him any relief on his petition, and we affirmed the denial on appeal. *Id.*

In 1994, Pizzuto filed a second petition for post-conviction relief in which he raised numerous errors in the proceedings leading to his conviction and sentence. The trial judge denied the petition on the ground that the claims raised were known, or reasonably should have been known, when Pizzuto filed his first petition and that they were therefore barred by Idaho Code § 19-2719. This Court affirmed the summary dismissal of Pizzuto's second petition. *Pizzuto v. State*, 127 Idaho 469, 903 P.2d 58 (1995).

In 1998, Pizzuto filed a third petition for post-conviction relief, which the trial judge summarily dismissed pursuant to Idaho Code § 19-2719. On appeal, this Court affirmed the dismissal. *Pizzuto v. State*, 134 Idaho 793, 10 P.3d 742 (2000).

In 2002, Pizzuto filed a fourth petition for post-conviction relief based upon *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). He alleged that the *Ring* opinion should be applied retroactively to his case. He also filed a motion under Rule 35 of the Idaho Criminal Rules to correct an illegal sentence, alleging that under *Ring* his sentence was illegal because a judge rather than a jury had made the factual findings upon which imposition of the death penalty was based. The district court ultimately dismissed the petition and denied the motion, and Pizzuto appealed. This Court dismissed his appeal upon motion of the State because *Ring v. Arizona* did not apply retroactively to cases such as Pizzuto's that were already final on direct review.

On June 19, 2003, Pizzuto filed a fifth petition for post-conviction relief based upon the opinion of the United States Supreme Court in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). In *Atkins*, the Supreme Court held that the execution of a murderer who was mentally retarded at the time of the killing constituted cruel and unusual punishment in violation of the Eighth Amendment. Pizzuto alleged that he is mentally retarded and sought to have his death sentence "reversed and vacated."

Judge Reinhardt had been the presiding judge at Pizzuto's criminal trial and sentencing and in his prior post-conviction proceedings. He had retired, and Judge Bradbury took office as his replacement in January

2003. The State disqualified Judge Bradbury without cause pursuant to Idaho Rule of Civil Procedure 40(d)(1), and Judge Reinhardt, who was serving as a senior district judge, was appointed to preside over this case. On August 4, 2003, Pizzuto moved to disqualify Judge Reinhardt without cause under Rule 40(d)(1) or, in the alternative, to disqualify him for cause on the ground that he was allegedly biased and prejudiced against Pizzuto. On January 18, 2005, Judge Reinhardt denied the motion for disqualification.

On July 9, 2003, the State moved to have Pizzuto's fifth petition summarily dismissed on two grounds: (1) the petition was not filed within a reasonable time after the *Atkins* opinion was released and (2) the petition sought a retroactive application of new law announced in *Atkins,* in violation of Idaho Code § 19–2719(5)(c). On September 23, 2005, Pizzuto moved for a summary judgment granting his requested relief. After a hearing on the motions, Judge Reinhardt dismissed Pizzuto's petition on the grounds that it had not been filed within forty-two days after the Supreme Court's opinion in *Atkins* and that Pizzuto had failed to raise a genuine issue of material fact supporting his claim of mental retardation. Pizzuto then timely appealed.

## II. ISSUES ON APPEAL

1. Did the district court err in denying Pizzuto's motion for disqualification without cause?

2. Did the district court err in denying Pizzuto's motion for disqualification for cause?

3. Did the district court err in summarily dismissing Pizzuto's petition on the ground that it was untimely?

4. Did the district court err in summarily dismissing Pizzuto's petition on the ground that he had failed to raise a genuine issue of material fact supporting his claim of mental retardation?

5. Did the district court err in dismissing Pizzuto's petition without permitting further testing?

6. Did the district court deny Pizzuto the equal protection of the law by failing to hold an evidentiary hearing on the issue of mental retardation?

7. Does Idaho Code § 19–2515A violate the Eighth and Fourteenth Amendments to the Constitution of the United States?

## III. ANALYSIS

### A. Did the District Court Err in Denying Pizzuto's Motion for Disqualification Without Cause?

■■■ "[P]etitions for post-conviction relief are civil proceedings governed by the Idaho Rules of Civil Procedure." *Storm v. State,* 112 Idaho 718, 720, 735 P.2d 1029, 1031 (1987). Rule 40(d)(1) of the Idaho Rules of Civil Procedures provides, "In all civil actions, the parties shall each have the right to one (1) disqualification of the judge without cause, except as herein provided." One of the exceptions stated in the rule is that the right of disqualification without cause does not apply to "[a] judge in a post-conviction proceeding, when that proceeding has been assigned to the judge who entered the judgment of conviction or sentence being challenged by the post-conviction proceeding." I.R.C.P. 40(d)(1)(I)(ii). Judge Reinhardt denied Pizzuto's motion for disqualification without cause based upon this exception.

Pizzuto asserts that this exception to the right of automatic disqualification does not apply in this case for three reasons. First, he points out that the exception only applies when the post-conviction proceeding "has been assigned" to the judge who entered the conviction or sentence being challenged. He argues that this case was assigned to Judge Bradbury, not to Judge Reinhardt, and therefore the exception does not apply. This case was originally assigned to Judge Bradbury. However, after he was disqualified, the administrative district judge assigned Judge Reinhardt to preside over all further proceedings in the case. Thus, this post-conviction proceeding was assigned to Judge Reinhardt.

Second, Pizzuto contends that the exception does not apply in this case because he is not seeking to invalidate the death sentence;

he is only seeking to prevent execution of the sentence. He contends that these proceedings are therefore separate and distinct from the underlying criminal conviction and sentence. Rule 40(d)(1), by its terms, is not limited to proceedings challenging the imposition of a sentence. It applies to post-conviction proceedings in which the "sentence [is] being challenged." A contention that the sentence imposed should not be carried out is a challenge to the sentence.

 Finally, Pizzuto claims that because the State disqualified Judge Bradbury without cause, it would be a denial of equal protection to deny him the right to disqualify Judge Reinhardt without cause. "The first step in an equal protection analysis is to identify the classification at issue." *McLean v. Maverik Country Stores, Inc.*, 142 Idaho 810, 814, 135 P.3d 756, 759 (2006). Pizzuto does not identify the classification he challenges. Rule 40(d)(1)(I)(ii) provides that in a post-conviction proceeding, a party may not disqualify without cause the judge "who entered the judgment of conviction or sentence being challenged by the post-conviction proceeding." Neither the State nor Pizzuto was entitled to challenge Judge Reinhardt without cause. Both of them were entitled to challenge without cause any other judge to whom this case was assigned. Other than making the assertion, Pizzuto offers no analysis, argument, or authority as to how he was allegedly deprived of the equal protection of the law by not being permitted to disqualify Judge Reinhardt without cause. "We will not consider assignments of error not supported by argument and authority in the opening brief." *Hogg v. Wolske*, 142 Idaho 549, 559, 130 P.3d 1087, 1097 (2006).

### B. Did the District Court Err in Denying Pizzuto's Motion for Disqualification for Cause?

In each of his post-conviction relief proceedings, Pizzuto sought unsuccessfully to disqualify Judge Reinhardt for cause. In this case, Pizzuto contended that Judge Reinhardt could not be impartial in this case because at Pizzuto's sentencing the Judge found that Pizzuto was of normal intelligence notwithstanding uncontroverted evidence to the contrary. Pizzuto supported his motion with an affidavit in which his counsel stated:

b. At the sentencing of Petitioner, undisputed evidence presented by Dr. Michael Emery revealed that Petitioner's IQ was 71 which places petitioner in the borderline mental retardation range. See Petition here and supporting Affidavits.[1]

c. Notwithstanding undisputed evidence to the contrary Judge George Reinhardt found that Petitioner was of normal intelligence.

d. The factfinding of Petitioner's intellectual functioning unsupported by the evidence is directly contrary to Petitioner's assertions and expert opinions previously presented and likely to be presented herein.

e. The Judge's commitment to a fact not supported by the evidence and contrary to the full weight of the evidence makes it impossible for this Court to fairly, impartially and neutrally consider the issue now raised.

 Contrary to counsel's assertion in her affidavit, Judge Reinhardt did not find that Pizzuto was "of normal intelligence." He specifically found, "The Defendant is unintelligent." Counsel later realized that her affidavit was incorrect. In a supplemental brief in support of the motion for disqualification, she moved to amend the motion to allege that Judge Reinhardt should be disqualified because he considered Pizzuto's low intelligence as an aggravating factor instead of a mitigating factor, which made it impossible for him to preside further in the matter.[2]

---

1. Contrary to counsel's assertion in her affidavit, Dr. Emery did not state "that Petitioner's IQ was 71." In his letter, Dr. Emery stated, "Intellectually Mr. Pizzuto scored a verbal WAIS I.Q. of 72 . . . ."

2. If the requested amendment of the motion for disqualification had been granted, it would have alleged:

That Judge George R. Reinhardt cannot fairly and impartially preside over the Petition for Postconviction Relief Raising *Atkins v. Virginia*, due to prior erroneous findings of fact

She did not notice that motion for hearing, and the district court did not rule upon it. Regardless, the proposed amendment did not state a ground for disqualification. Evidence of low intelligence offered by a defendant in a murder case is a "two-edged sword," relevant to both aggravation and mitigation. *See, Penry v. Lynaugh,* 492 U.S. 302, 324, 109 S.Ct. 2934, 2949, 106 L.Ed.2d 256, 281 (1989). The fact that Judge Reinhardt found it an aggravating factor is not a ground for disqualification.

In his supplemental brief in support of the motion for disqualification, Pizzuto also attached copies of affidavits and a motion for disqualification filed in the trial court in 1994 in Pizzuto's second post-conviction relief case, *Pizzuto v. State,* 127 Idaho 469, 903 P.2d 58 (1995). The affidavits were of Pizzuto's father, mother, and sister, and they each alleged that Judge Reinhardt made statements indicating bias during the time of Pizzuto's criminal trial. Judge Reinhardt's refusal to disqualify himself was not addressed on the merits in that appeal because the Court decided the appeal without reviewing or referring to any determination made by Judge Reinhardt. 127 Idaho at 471, 903 P.2d at 60.

Pizzuto also sought to have Judge Reinhardt disqualify himself in Pizzuto's third petition for post-conviction relief. The motion was accompanied by the previously filed affidavits of his father, mother, and sister. Judge Reinhardt refused to disqualify himself, and Pizzuto raised that refusal on appeal. However, on appeal he argued another ground for disqualification and did not argue that the statements attributed to Judge Reinhardt by Pizzuto's father, mother, and sister were evidence of bias. *Pizzuto v. State,* 134 Idaho 793, 799, 10 P.3d 742, 748 n. 2 (2000).

Pizzuto has known of the statements attributed to Judge Reinhardt since his trial. He has had ample opportunity to assert they are evidence of bias in his first and third post-conviction proceedings, and he chose not

to do so. He has therefore waived any claim of bias based upon those alleged statements. Judge Reinhardt did not err in refusing to grant the motion for disqualification.

## C. Did the District Court Err in Summarily Dismissing Pizzuto's Petition on the Ground that It Was Untimely?

In *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the United States Supreme Court held that the Eighth Amendment did not prohibit the execution of mentally retarded offenders. Thirteen years later in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the Supreme Court reversed itself and construed the Eighth Amendment to prohibit the imposition of a death sentence upon offenders who are mentally retarded at the time of their crime. The Supreme Court released its opinion in *Atkins* on June 20, 2002. Pizzuto filed his petition for post-conviction relief in this case on June 19, 2003. The district court held that Pizzuto failed to file his petition timely because he should have filed it within forty-two days after the Supreme Court released its opinion in *Atkins.* In so holding, the district court erred.

Within forty-two days after entry of the judgment, a defendant sentenced to death must file a petition for post-conviction relief raising any legal or factual challenge to the sentence or conviction that is known or reasonably should be known. For claims not known or knowable within that forty-two day period, "I.C. § 19–2719 still requires a defendant to bring the claims within a reasonable time after the claims were known or should have been known." *Pizzuto v. State,* 134 Idaho 793, 798, 10 P.3d 742, 747 (2000). Pizzuto obviously could not have known of his claim under *Atkins v. Virginia* within forty-two days after entry of his judgment since the *Atkins* opinion was released six years after Pizzuto was sentenced. Therefore, Pizzuto must have brought this claim within a reasonable time after it was known or reasonably should have been known.

in support of the death penalty, including an affirmative finding that Petitioner was "unintelligent under Findings in Aggravation" notwithstanding evidence which supports deficient intellectual functioning is mitigating in

nature which finding skews the factfinding and application thereof in a manner which makes it impossible for Judge George R. Reinhardt to constitutionally preside further in this matter.

In *Atkins,* the Supreme Court left to the individual States " 'the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences.' " 536 U.S. at 317, 122 S.Ct. at 2250, 153 L.Ed.2d at 348 (quoting *Ford v. Wainwright,* 477 U.S. 399, 416–17, 106 S.Ct. 2595, 2605, 91 L.Ed.2d 335, 351 (1986)). Upon the release of the *Atkins* opinion, Pizzuto could begin accumulating the information and reports necessary to challenge his death sentence. Indeed, almost all of the material he filed with his petition had been accumulated by him years prior to the *Atkins* opinion. However, it would certainly be reasonable for him to delay actually filing this proceeding until Idaho enacted the appropriate procedures, including a definition of "mentally retarded." The legislature did so, and that statute took effect on March 27, 2003. Ch. 136, § 6, 2003 Idaho Sess. Laws. Pizzuto waited another eighty-four days until June 19, 2003, to file this proceeding. The issue is whether that delay was reasonable.

We have previously addressed what is a reasonable time on a case-by-case basis. For example, in *Dunlap v. State,* 131 Idaho 576, 961 P.2d 1179 (1998), we held that a petition filed within forty-two days after the petitioner knew or reasonably could have known of his claim was filed within a reasonable time. In *Rhoades v. State,* 135 Idaho 299, 17 P.3d 243 (2000), we held that a six-month delay in filing a petition was not a reasonable time. In *Rhoades,* the State argued that a reasonable time for filing a successive petition for post-conviction relief should not exceed forty-two days after the claim was known or reasonably knowable. We acknowledged that there "is logic to this position" and that it is supported by our "reference to the forty-two day time limit in *Dunlap.*" 135 Idaho at 301, 17 P.3d at 245. In the instant case the State renews its argument that a reasonable time for bring a successive petition for post-conviction relief should not exceed forty-two days after the claim was known or reasonably knowable. Conversely, Pizzuto argues that the "reasonable time" requirement is unconstitutionally vague because it is determined after the fact and does not give a petitioner adequate advance notice of when the petition must be filed.

■ After considering these arguments, we hold that a reasonable time for filing a successive petition for post-conviction relief is forty-two days after the petitioner knew or reasonably should have known of the claim, unless the petitioner shows that there were extraordinary circumstances that prevented him or her from filing the claim within that time period. In that event, it still must be filed within a reasonable time after the claim was known or knowable.

■ Pizzuto argues that his petition was filed within a reasonable time considering the complexity of the issue and the time required to develop the facts. The record does not support that assertion. The reasonable time at issue is the time necessary to develop sufficient facts to file the post-conviction proceeding, not the time necessary to develop all facts that will be offered in an attempt to prove the claim. When Pizzuto filed his petition on June 29, 2003, he submitted copies of a letter dated January 23, 1986, from Dr. Emery; an affidavit dated April 1, 1988, from Dr. Merikangas; a 1996 report from Dr. Beaver; and an affidavit dated June 18, 2003, from Dr. Beaver. The latter affidavit from Dr. Beaver was based upon his 1996 evaluation of Pizzuto. Assuming that this latter affidavit was necessary in order to file the petition,[3] there was no showing or allegation that it could not have been obtained within forty-two days after Idaho Code § 19–2515A went into effect.

However, because Pizzuto did not have advance notice of our further clarification of what is a reasonable time, we will not apply it to him in this case. We simply hold that the district court erred in holding that Pizzuto should have filed his claim within forty-two days after the Supreme Court released its opinion in *Atkins.* For the purposes of this appeal, we will consider Pizzuto's petition as being filed timely.

**3.** Pizzuto did not refer to it in the briefs and argument in the district court or in the briefing

on appeal.

**D. Did the District Court Err in Summarily Dismissing Pizzuto's Petition on the Ground that He Had Failed to Raise a Genuine Issue of Material Fact Supporting His Claim of Mental Retardation?**

▆▆▆▆ On July 9, 2003, the State moved to dismiss Pizzuto's petition on the grounds that it was untimely and would constitute the retroactive application of new law.[4] On September 23, 2005, Pizzuto moved for summary judgment. The district court granted summary judgment to the State on the grounds that Pizzuto's petition was untimely and that Pizzuto had failed to raise a genuine issue of material fact regarding his claim of mental retardation. Although the State did not move for summary judgment, "[t]he district court may grant summary judgment to a non-moving party even if the party has not filed its own motion with the court." *Harwood v. Talbert*, 136 Idaho 672, 677, 39 P.3d 612, 617 (2001). Pizzuto moved for summary judgment on the same issue upon which the district court granted summary judgment to the State. Therefore, the district court could grant summary judgment to the nonmoving party on that issue. *Id.*

▆▆▆▆ We review the grant of summary judgment to a nonmoving party under the same standard we would to the moving party. *Id.* In this case, Pizzuto was not entitled to a jury trial. "When an action will be tried before the court without a jury, the trial court as the trier of fact is entitled to arrive at the most probable inferences based upon the undisputed evidence properly before it and grant the summary judgment despite the possibility of conflicting inferences." *Shawver v. Huckleberry Estates, L.L.C.*, 140 Idaho 354, 360–61, 93 P.3d 685, 691–92 (2004). "The test for reviewing the inferences drawn by the trial court is whether the record reasonably supports the inferences." *Id.*

▆▆▆▆ "To withstand summary dismissal, a post-conviction applicant must present evidence establishing a *prima facie* case as to each element of the claims upon which the applicant bears the burden of proof." *State v. Lovelace*, 140 Idaho 53, 72, 90 P.3d 278, 297 (2003). A "*prima facie* case" means the "production of enough evidence to allow the fact-finder to infer the fact at issue and rule in the party's favor." *Black's Law Dictionary* 1209 (Bryan A. Garner ed., 7th ed., West 1999). Thus, Pizzuto had the burden of presenting evidence on each element of his claim under Idaho Code § 19–2515A(1).[5] *Raudebaugh v. State*, 135 Idaho 602, 21 P.3d 924 (2001).

The definition of the term "mentally retarded" in Idaho Code § 19–2515A(1) requires that the offender have "significantly subaverage general intellectual functioning" and that such functioning be "accompanied by significant limitations in adaptive functioning in at least two" of ten listed areas. Finally, the statute requires that "[t]he onset of significant subaverage general intelligence functioning and significant limitations in adaptive functioning must occur before age eighteen (18) years." The statute defines "significantly subaverage general intellectual

---

4. Idaho Code § 19–2719(5)(c) provides, "A successive post-conviction pleading asserting the exception [that the claim was not known or reasonably knowable within forty-two days after entry of the judgment imposing the death sentence] shall be deemed facially insufficient to the extent it seeks retroactive application of new rules of law." The decision of the United States Supreme Court in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), must be applied retroactively. *See, Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Schriro v. Smith*, 546 U.S. 6, 126 S.Ct. 7, 163 L.Ed.2d 6 (2005). Because of the Supremacy Clause, Idaho Code § 19–2719(5)(c) cannot prevent the *Atkins* opinion from being applied retroactively in this case.

5. Idaho Code § 19–2515A(1) provides:

(1) As used in this section:
 (a) "Mentally retarded" means significantly subaverage general intellectual functioning that is accompanied by significant limitations in adaptive functioning in at least two (2) of the following skill areas: communication, self-care, home living, social or interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety. The onset of significant subaverage general intelligence functioning and significant limitations in adaptive functioning must occur before age eighteen (18) years.
 (b) "Significantly subaverage general intellectual functioning" means an intelligence quotient of seventy (70) or below.

functioning" as "an intelligence quotient of seventy (70) or below." Thus, the statutory definition of "mentally retarded" requires proof of three elements: (1) an intelligence quotient (IQ) of 70 or below; (2) significant limitations in adaptive functioning in at least two of the ten areas listed; and (3) the onset of the offender's IQ of 70 or below and the onset of his or her significant limitations in adaptive functioning both must have occurred before the offender turned age eighteen. Significant limitations in adaptive functioning alone will not bring an offender within the protection of the statute. As stated by the Supreme Court in *Atkins v. Virginia*, 536 U.S. 304, 317, 122 S.Ct. 2242, 2250, 153 L.Ed.2d 335, 347 (2002), "Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus."

In order for Pizzuto to have presented a *prima facie* case, there must be evidence showing that he had an IQ of seventy or below before age eighteen. Pizzuto was born January 11, 1956. Therefore, there must be evidence showing that his IQ was 70 or below prior to his eighteenth birthday on January 11, 1974.

The record reflects only one IQ score for Pizzuto. He scored a Verbal IQ of 72 on the Wechsler Adult Intelligence Scale, Revised, administered to him by Dr. Emery on December 12, 1985. At that time, Pizzuto was thirty days short of his twenty-ninth birthday. There is no expert testimony opining what Pizzuto's IQ probably would have been eleven years earlier. Pizzuto argues that an IQ score is only accurate within five points. He contends that his actual IQ could have been five points lower or higher than 72. There are two problems with that argument.

First, when enacting Idaho Code § 19–2515A(1), the legislature did not require that the IQ score be within five points of 70 or below. It required that it be 70 or below. Although Pizzuto argued that the district court should infer that Pizzuto's actual IQ was lower than his test score, the court could just as reasonably have inferred that it was higher. The alleged error in IQ testing is plus or minus five points. The district court

was entitled to draw reasonable inferences from the undisputed facts. *Shawver v. Huckleberry Estates, L.L.C.*, 140 Idaho 354, 360–61, 93 P.3d 685, 691–92 (2004). It would be just as reasonable to infer that Pizzuto's IQ on December 12, 1985, was 77 as it would be to infer that it was 67.

Second, Pizzuto's argument also requires the district court to infer that Pizzuto's IQ had not decreased during the eleven-year period from his eighteenth birthday to the date of his IQ test. The district court, as the trier of fact, was not required to make that inference, especially in light of the opinions of Pizzuto's experts that his long history of drug abuse and his epilepsy would have negatively impacted his mental functioning.

In 1988 Dr. Merikangas reviewed Pizzuto's available medical records and various medical and psychological reports prepared by several experts during 1985 through 1987. Based upon his review of those records, Dr. Merikangas suggested that Pizzuto suffered a brain injury either when he sustained a fractured skull at age 2½ or when he had a motorcycle accident at age 14 and that Pizzuto's epilepsy is a symptom of that brain injury. The epilepsy was first diagnosed in 1983, but Pizzuto reported having seizures beginning in adolescence or early adulthood. Dr. Merikangas also noted, "Mr. Pizzuto has a life long history of almost continuous drug abuse including intravenous Heroin as well as cocaine, speed and marijuana." He opined that Pizzuto's long history of drug abuse has "caused him further neurological dysfunction and has caused him to have substantial defects of mind and reason." According to Dr. Merikangas, "We will probably not know to any any [sic] scientific degree of accuracy what his state of mind was at the time of the alleged crimes but we do know without any doubt that [he] is not a normal human being."

Dr. Beaver conducted a comprehensive neuropsychometric examination of Pizzuto on February 12, 1996, to evaluate his neurocognitive functioning and to assist in evaluating his mental status. He concluded, "The combination of Jerry Pizzuto having a seizure disorder, neurocognitive limitations that affect his impulse control and decision-mak-

ing, combined with the neurotoxic affects of polysubstance abuse would have significantly impacted his abilities to make appropriate decisions and to control his behavior in an appropriate and community acceptable manner." Pizzuto also submitted an affidavit of Dr. Beaver dated September 15, 2004. In that affidavit, Dr. Beaver stated, "[G]iven that it has been over eight years since his last comprehensive neuropsychological examination, I would strongly recommend that he undergo repeat neuropsychometric studies.... Often, patients that have persistent seizure disorders, for example, will decline over time in their overall mental abilities." Thus, Dr. Beaver felt that Pizzuto's mental functioning could have declined over an eight year period just due to his seizure disorder. The district court certainly could have inferred that it would also have declined during the eleven-year period from Pizzuto's eighteenth birthday to the date of his IQ testing, where Pizzuto was not only suffering from epileptic seizures but was also abusing various drugs.

Pizzuto relied solely upon Dr. Emery's IQ determination. Pizzuto did not disclose whether Dr. Beaver did IQ testing in connection with his comprehensive neuropsychometric examination on February 12, 1996. If Pizzuto desired further IQ testing, he should have obtained it. The district court did not err in relying upon the only IQ score in the record to conclude that Pizzuto had failed to show he met the statutory definition of mental retardation.

Although not argued by Pizzuto, there is one additional affidavit of Dr. Beaver that should be addressed. Pizzuto submitted with his petition an affidavit from Dr. Beaver dated June 18, 2003. In that affidavit (2003 Affidavit), Dr. Beaver stated as follows:

4. In 1996, I conducted comprehensive neuropsychological examination of Gerald R. Pizzuto, Jr. This included review of multiple records, interviews with Mr. Pizzuto and his mother. Also, he underwent comprehensive neuropsychological assessment.

5. Gerald R. Pizzuto, Jr. demonstrated limited intellectual skills indicative of possible of [sic] mild mental retarda-

tion. Additionally, he evidenced organic brain syndrome.

6. Gerald R. Pizzuto, Jr. likely meets the standard recently enacted in Idaho Code Section 19–2515A regarding defendants who are mentally retarded and involved with first degree murder proceedings.

The issue is whether this Affidavit would have precluded granting summary judgment to the State.

In the 2003 Affidavit, Dr. Beaver stated that his 1996 comprehensive neuropsychological examination of Pizzuto indicated "possible mild mental retardation." " 'Mild' mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70." *Atkins v. Virginia*, 536 U.S. 304, 308 n. 3, 122 S.Ct. 2242, 2245 n. 3, 153 L.Ed.2d 335, 342 n. 3 (2002) (quoting from the Diagnostic and Statistical Manual of Mental Disorders 42–43 (4th ed.2000)). An opinion that Pizzuto had *possible* mild mental retardation in 1996 is not an opinion that he had an IQ of 70 or below twenty-two years earlier.

In the 2003 Affidavit, Dr. Beaver also stated that Pizzuto "likely meets the standard recently enacted in Idaho Code Section 19–2515A regarding defendants who are mentally retarded." The question is whether this statement must be inferred as stating that Pizzuto had an IQ of 70 or below prior to his eighteenth birthday on January 11, 1974. For the following reasons, the trial court was not required to draw that inference.

First, Pizzuto did not argue to the trial court that the 2003 Affidavit should be so construed. He did not refer to this Affidavit in his "Statement of Material Facts in Support of Summary Judgment" filed on September 23, 2005; nor did he refer to it in oral argument. He likewise did not refer to the affidavit in his briefing and argument on appeal. If we relied upon the affidavit to hold that the district court erred, we would be deciding the appeal on an issue not raised or argued by Pizzuto. *See, Sprinkler Irr. Co., Inc. v. John Deere Ins. Co., Inc.*, 139 Idaho 691, 85 P.3d 667 (2004) (where the plaintiff did not argue to the trial court that its verified complaint provided sufficient ma-

terial facts to counter the defendant's motion for summary judgment, this Court would not consider that argument on appeal).

Second, Pizzuto admitted during oral argument on appeal that neither Dr. Beaver nor any other expert expressed any opinion as to whether Mr. Pizzuto meets the standard set forth in Idaho Code 19–2515A.[6] If we were to so construe the 2003 Affidavit, we would be giving it a construction that Pizzuto admits it should not be given.

Third, in the 2003 Affidavit Dr. Beaver opines that Pizzuto "likely meets the standard recently enacted in Idaho Code Section 19–2515A regarding defendants who are mentally retarded." In the context of Dr. Beaver's other statements in this case, it is clear that he was talking about Pizzuto's present condition, not his condition at age eighteen. As mentioned above, Dr. Beaver conducted a comprehensive neuropsychological examination of Pizzuto in 1996. In the 2003 Affidavit, Dr. Beaver stated that his 1996 examination of Pizzuto indicated *possible* mild mental retardation. He then stated that Pizzuto "likely meets the standard recently enacted in Idaho Code Section 19–2515A regarding defendants who are mentally retarded and involved with first degree murder proceedings." In an affidavit dated September 15, 2004, Dr. Beaver explained that patients, such as Pizzuto, who have persistent seizure disorders will often decline over time in their overall mental abilities and that a current evaluation of Pizzuto is indicated to determine if he meets the criteria announced in *Atkins v. Virginia.* Thus, Dr. Beaver stated that his 1996 comprehensive neuropsychological examination of Pizzuto indicated *possible* mild mental retardation; the mental abilities of persons like Pizzuto who have persistent seizure disorders often decline over time; and Pizzuto likely now meets the standard of Idaho Code § 19–2515A.

■ The focus upon whether Pizzuto is currently mentally retarded is consistent with Pizzuto's claim that *Atkins v. Virginia* protects offenders who become mentally retarded at any time prior to execution. The issue in *Atkins v. Virginia* is not whether the offender is currently mentally retarded. The issue is whether the offender was mentally retarded when he or she committed the murder and whether such mental retardation began prior to the offender's eighteenth birthday.

The *Atkins* Court began by recognizing that its prior cases identified retribution and deterrence as the societal purposes served by the death penalty. It then analyzed those two purposes as to how they relate to the mentally retarded.

It first noted that retribution is based upon the culpability of the murderer. It determined that the mentally retarded have diminished culpability due to their mental impairments. The Court reasoned, "Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." 536 U.S. at 318, 122 S.Ct. at 2250, 153 L.Ed.2d at 348. The Court added, "[T]here is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders." *Id.* It concluded, "If the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State [the death penalty], the lesser culpability of the mentally retarded offender surely does not merit that form of retribution." 536 U.S. at 319, 122 S.Ct. at 2251, 153 L.Ed.2d at 349.

The Court also found that the existence of the death penalty would have little deterrent effect on the mentally retarded. It stated, "[I]t is the same cognitive and behavioral impairments that make these defendants less

---

6. During oral argument on appeal, the following exchange occurred:

Chief Justice Eismann: Q. Did he [Dr. Beaver] express any opinion as to whether Mr. Pizzuto meets the standard set forth in Idaho Code 19–2515A?

Ms. Fisher: A. He did not, your Honor.

Chief Justice Eismann: Q. Did any expert offer an opinion as to whether Mr. Pizzuto meets that standard of mental retardation?

Ms. Fisher: A. No.

morally culpable ... that also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information." 536 U.S. at 320, 122 S.Ct. at 2251, 153 L.Ed.2d at 349. It concluded, "Thus, executing the mentally retarded will not measurably further the goal of deterrence." *Id.*

The Court also added that because of their mental impairments, mentally retarded offenders may give false confessions, be unable to give meaningful assistance to their counsel, make poor witnesses, and project an unwarranted impression that they lacked remorse. In addition, mental retardation presented as a mitigating factor may support the aggravating factor of future dangerousness.

The rationale for exempting mentally retarded murderers from the death penalty is based upon their mental impairments at the time they committed the killings and, to a lesser extent, during their criminal trials and sentencing hearings. The exemption should be no broader than its supporting rationale. Thus, an offender would not be entitled to relief based upon *Atkins v. Virginia* if he was mentally impaired at the time of his crime, and possibly through his sentencing, but it was not until later that his mental condition deteriorated to the point of becoming mentally retarded.

In that respect, *Atkins v. Virginia* differs from *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). In the latter case, the Supreme Court held that the Eighth Amendment prevents the execution of a person who became insane after his trial and sentencing. The reasons for that holding were: (1) "For today, no less than before, we may seriously question the retributive value of executing a person who has no comprehension of why he has been singled out and stripped of his fundamental right to life" and (2) "Similarly, the natural abhorrence civilized societies feel at killing one who has no capacity to come to grips with his own conscience or deity is still vivid today." 477 U.S. at 409, 106 S.Ct. at 2601, 91 L.Ed.2d at 346. There is no contention that Pizzuto's mental functioning has declined to that point. In *Penry v. Lynaugh*, the Supreme Court recognized the distinction between the insane and the mildly mentally retarded. It stated that the profoundly or severely retarded who are wholly lacking the capacity to appreciate the wrongfulness of their conduct would likely not be convicted or face the prospect of punishment. The mildly retarded, however, are usually competent to stand trial, to consult with counsel with a reasonable degree of rational understanding, and to have a rational and factual understanding of the proceedings against them.[7]

Pizzuto was found to be competent to stand trial in his criminal case. In Dr. Emery's opinion, "Mr. Pizzuto clearly understands the nature of the charges against him and their potential consequences and he is capable of assisting in his own defense" and "Mr. Pizzuto has the capacity to enter into a state of mind which could be an element of

7. In *Penry v. Lynaugh*, 492 U.S. 302, 333, 109 S.Ct. 2934, 2954–55, 106 L.Ed.2d 256, 287–88 (1989), the Supreme Court stated:

The common law prohibition against punishing "idiots" for their crimes suggests that it may indeed be "cruel and unusual" punishment to execute persons who are profoundly or severely retarded and wholly lacking the capacity to appreciate the wrongfulness of their actions. Because of the protections afforded by the insanity defense today, such a person is not likely to be convicted or face the prospect of punishment. See ABA Standards for Criminal Justice 7–9.1, commentary, p. 460 (2d ed.1980) (most retarded people who reach the point of sentencing are mildly retarded). Moreover, under *Ford v. Wainwright*, 477 U.S. 399[ 106 S.Ct. 2595] (1986), someone who is "unaware of the punishment they are about to suffer and why they are to suffer it" cannot be executed. *Id.*, at 422[ 106 S.Ct. 2595] (Powell, J., concurring in part and concurring in judgment).

Such a case is not before us today. Penry was found competent to stand trial. In other words, he was found to have the ability to consult with his lawyer with a reasonable degree of rational understanding, and was found to have a rational as well as factual understanding of the proceedings against him. *Dusky v. United States*, 362 U.S. 402[, 80 S.Ct. 788, 4 L.Ed.2d 824] (1960); App. 20–24. In addition, the jury rejected his insanity defense, which reflected their conclusion that Penry knew that his conduct was wrong and was capable of conforming his conduct to the requirements of the law.

the offense for which he is charged." Pizzuto did not challenge on appeal the finding that he was competent to stand trial. *State v. Pizzuto,* 119 Idaho 742, 810 P.2d 680 (1991). The jury found that he had the mental capacity to have the specific intents required for conviction of the crimes charged, and he did not challenge those findings on appeal. There is no contention that Pizzuto's execution would be barred by *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).

■ Pizzuto had the burden of showing that at the time of his murders he was mentally retarded as defined in Idaho Code § 19–2515A(1)(a) and that his mental retardation occurred prior to his eighteenth birthday. To prevent summary judgment from being granted to the State, he had to create a genuine issue of material fact on each element of his claim. A mere scintilla of evidence or only slight doubt is not sufficient to create a genuine issue of material fact. *Blickenstaff v. Clegg,* 140 Idaho 572, 577, 97 P.3d 439, 444 (2004). One requirement of proving mental retardation is that Pizzuto had an IQ of 70 or below at the time of the murders and prior to his eighteenth birthday. He did not offer any expert opinion showing that he did. He likewise did not offer any expert opinion stating that he was mentally retarded at the time of the murders or prior to age eighteen. The district court did not err in granting summary judgment to the State.

### E. Did the District Court Err in Dismissing Pizzuto's Petition without Permitting Further Testing?

■ On October 25, 2004, Pizzuto filed a motion seeking to be transported to an appropriate medical facility so that Dr. Merikangas could perform specific testing upon Pizzuto. The additional testing requested was as follows:

(1) Neuroprofile, five hour glucose tolerance test and a urinalysis,

(2) An electroencephalogram, to include photic stimulation and hyperventilation,

(3) A magnetic resonance image of the brain without contrast, and

(4) A positron emission tomography scan and a single photon emission computed tomography scan of the brain, which would include an injection of contrast material and a short time delay before the images were taken.

Pizzuto did not notice this motion for hearing.

The parties did briefly discuss the motion on April 22, 2005, when they argued Pizzuto's motions to file an interlocutory appeal of the district judge's refusal to disqualify himself and to strike the appointment of the Attorney General as a special prosecutor in this case. After the district court denied both motions, the parties discussed the briefing schedule for the State's motion for summary dismissal. During that discussion, Pizzuto's counsel stated that she could not ask the district court to rule on her motion for testing, apparently because she believed the judge should be disqualified from presiding in the case and therefore from ruling on the motion. She then asked whether the State would stipulate to the testing, and the State's attorney stated he would think about it. Pizzuto's counsel concluded the issue by stating that she and the State would discuss the matter further.[8] Without pursuing the motion for testing, Pizzuto moved for summary judgment on September 23, 2005.

At the conclusion of oral argument on Pizzuto's motion for summary judgment, his counsel asked the district court not to dis-

---

8. The dialogue was as follows:

 Ms. Fisher: If we're going to move forward on a testing—I mean, on a briefing schedule—I guess I can't do that, Judge, because I don't think you can rule. So I guess I can't ask you to rule on my testing.

 The Court: On your testing?

 Ms. Fisher: For my client, right.

 The Court: Oh, sure. I understand.

 Ms. Fisher: All I want is a motion for access—an order for access to the client. Maybe the State would stipulate to the testing to take place while we're pending the interlocutory appeals and the briefing schedule, Lamont?

 Mr. Anderson: I'm going to have to think about that.

 Ms. Fisher: Okay. So the State and I will discuss the possibility of moving forward on access to my client for further testing in this regard.

miss the action if it did not grant the motion for summary judgment. Pizzuto's counsel requested that the court instead give further guidance as to what was required to prove a *prima facie* case and permit additional testing if the court believed an expert opinion was necessary.[9]

Pizzuto's counsel asserted below that there was no statutory or judicial definition of mental retardation applicable in post-conviction proceedings, and therefore she had little guidance as to the evidence necessary to make a *prima facie* case. She contended that the definition of mental retardation in Idaho Code § 19–2515A only applied when the issue of mental retardation was raised in pretrial proceedings and that it did not apply when the issue was raised in post-conviction proceedings. Subsection (6) of the statute states, "Any remedy available by post-conviction procedure or habeas corpus shall be pursued according to the procedures and time limits set forth in section 19–2719, Idaho Code." That subsection would be meaningless unless it contemplated that the statutory definition of "mentally retarded" also applied to post-conviction proceedings.

The definition of "mentally retarded" in Idaho Code § 19–2515A requires that the defendant have an IQ of 70 or below both at the time of the murder(s) and prior to age eighteen. In its briefing opposing Pizzuto's motion for summary judgment, the State argued that Pizzuto had failed to provide evidence that his IQ was 70 or below and failed to provide evidence showing it was 70 or below prior to his eighteenth birthday. Pizzuto's alleged IQ is obviously a matter requiring expert testimony. He did not offer any expert testimony opining that his IQ was ever 70 or below, nor does he allege that the requested additional testing was intended to address that issue. Whether or not a person is mentally retarded is obviously a matter requiring an expert's opinion. Pizzuto did not offer any expert testimony on that issue.

■ Pizzuto did not ask the district court to rule on his motion for the specified additional testing. He asked the district court to refrain from dismissing the petition if the court denied Pizzuto's motion for summary judgment and to give Pizzuto's counsel additional guidance as to what proof was lacking. If a trial court denies a party's motion for summary judgment, it has discretion to grant summary judgment to the opposing party. *Harwood v. Talbert*, 136 Idaho 672, 677, 39 P.3d 612, 617 (2001); I.R.C.P. 56(c). The real issue presented by the facts is whether the district court abused its discretion by granting summary judgment to the State rather than by simply denying Pizzuto's motion and giving him the requested guidance on how to proceed further. When reviewing an alleged abuse of discretion by the trial court, our inquiry is:

> (1) whether the trial judge correctly perceived the issue as one of discretion; (2) whether the trial judge acted within the outer boundaries of his or her discretion and consistently with the legal standards applicable to the specific available choices; and (3) whether the trial judge reached his or her decision by an exercise of reason.

*Hudelson v. Delta Int'l Machinery Corp.*, 142 Idaho 244, 248, 127 P.3d 147, 151 (2005). Pizzuto has not argued that the district court abused its discretion in this case.

**F. Did the District Court Deny Pizzuto the Equal Protection of the Law by Failing to Hold an Evidentiary Hearing on the Issue of Mental Retardation?**

■ Pizzuto claims that the district court denied him the equal protection of the law

---

**9.** Pizzuto's counsel made the follow request:

> Ms. Fisher: ... If the Court does come to the conclusion on the basis of the record of the prior proceedings and what we've submitted thus far is not sufficient to go forward, which I can't imagine it doing, but if you do, I would suggest that rather than dismiss us outright, that you give us the opportunity to—you know, that you rule on that motion for additional testing, and you permit us to go forward to develop the evidence so that we can, in fact, present, if you think, an expert—further expert

opinion is necessary so we can present that, or that you at least give us some time to submit more—I mean, you know, there's sort of this place where I think we've reached a prima facie, well above it, but if we haven't because there's no standard that says what a prima facie case is, it's reasonable to give us sufficient notice of what you think a prima facie case is and see if we can meet it. Does that make sense, Judge?

> The Court: I think I understand what you have just said.

under both the Idaho and United States Constitutions by failing to give him an evidentiary hearing on the issue of mental retardation. He relies upon Idaho Code § 19–2515A(2) which requires the court to conduct a pretrial hearing regarding a capital defendant's claim of mental retardation upon receiving notice of the defendant's intention to raise the issue. That portion of the statute applies only to claims of mental retardation raised in pretrial proceedings, and the defendant does not have to make any preliminary showing to obtain the hearing. Pizzuto argues that if a defendant charged with a capital offense in a criminal case can obtain a hearing on mental retardation simply by requesting it, it is a denial of equal protection to fail to grant the same right to a petitioner in civil post-conviction proceedings.

 "The longstanding rule of this Court is that we will not consider issues that are raised for the first time on appeal. The exception to this rule is that constitutional issues may be considered for the first time on appeal if such consideration is necessary for subsequent proceedings in the case." *Row v. State*, 135 Idaho 573, 580, 21 P.3d 895, 902 (2001) (citations omitted). No subsequent proceedings are necessary in this case, and therefore we will not address this issue.

**G. Does Idaho Code § 19–2515A Violate the Eighth and Fourteenth Amendments to the Constitution of the United States?**

 Pizzuto claims that Idaho Code § 19–2515A violates the Eighth Amendment because it fails to comply with the mandate set forth in *Atkins v. Virginia*. Pizzuto did not raise this issue below, and therefore we will not consider it on appeal. *Row v. State*, 135 Idaho 573, 21 P.3d 895 (2001)

## IV. CONCLUSION

We affirm the judgment of the district court dismissing Pizzuto's petition in this case.

Justices BURDICK, W. JONES and Justices Pro Tem TROUT and JUDD concur.