# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
March 4, 2008 Session

## PERRY ANTHONY CRIBBS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
No. P-20670     Carolyn Blackett, Judge

---

**No. W2006-01381-CCA-R3-PD  - Filed July 1, 2009**

---

THOMAS T. WOODALL, J., concurring in part and dissenting in part.

I respectfully dissent from that portion of the majority opinion which concludes that Petitioner received ineffective assistance of counsel because his trial counsel failed to adequately present proof of Petitioner's mental impairment at the sentencing hearing. Petitioner failed to establish actual prejudice under Strickland. Otherwise, I concur in the results of the majority opinion which are consistent with affirming the judgment of the post-conviction court. I also write separately to set forth my conclusions on the issue of whether Petitioner meets the statutory definition of being mentally retarded.

## WHETHER PETITIONER IS MENTALLY RETARDED

Petitioner submits that mental retardation is immutable, in other words, once diagnosed mentally retarded, always mentally retarded. Petitioner thus asserts that, since Petitioner satisfied the requirements of Tennessee Code Annotated section 39-13-203(a), Petitioner was mentally retarded at the time of the crime and cannot be subject to the death penalty. Additionally, Petitioner asserts that there is remarkable consistency with Petitioner's IQ scores of 70, 73, and 75. And, while Petitioner acknowledges that Tennessee, in Howell v. State, 151 S.W.3d 450, 459 (Tenn. 2004), has adopted a bright line rule regarding the IQ of 70, he does cite to Dr. Auble's comment that Petitioner had taken the Wechsler test at least three and maybe four times by 1999 and that there could have been some inflation of his score due to the practice effect. Finally, Petitioner asserts that the IQ score relied upon by the trial court was the result of a test administered in June 1990, and, not at the time of the crime in 1994.

In Atkins, the United States Supreme Court held that the Eighth Amendment of the United States Constitution prohibited the execution of mentally retarded criminals. Atkins, 563 U.S. at 321, 122 S. Ct. at 2252. This holding clearly implied that the defendant must be mentally retarded at the time the crime is committed for the Eighth Amendment bar to apply. Tennessee Code Annotated section 39-13-203 defines mental retardation as a functional intelligence quotient (IQ) of seventy (70) or below with deficits in adaptive behavior. The statute requires that this mental retardation, whenever applicable to the time of commission of murder, must also have already been manifested

prior to the murder, and by the time a defendant was eighteen (18) years of age. Thus, the mandate of Atkins and section 39-13-203(b), which provides that the defendant must be mentally retarded at the time of committing first degree murder, cannot be ignored.

In reaching its decision in Atkins, the United States Supreme Court questioned whether the justification for the death penalty, *i.e.*, "retribution and deterrence," applies to mentally retarded offenders. Atkins, 563 U.S. at 318-319, 122 S. Ct. at 2251 (citing Gregg v. Georgia, 428 U.S. 153, 183, 96 S. Ct. 2909 (1976)(joint opinion of Stewart, Powell and Stevens, JJ). The high court determined that, "[u]nless the imposition of the death penalty on a mentally retarded person 'measurably contributes to one or both of these goals, it 'is nothing more than the purposeless and needless imposition of pain and suffering.'" Id. (citing Enmund, 458 U.S. at 798, 102 S. Ct. 3368). The Court continued to relate retribution to the culpability of the offender. In this regard, the Court noted that "the lesser culpability of the mentally retarded offender surely does not merit that form [execution] of retribution." Id. The culpability of the offender focuses on the status of the offender at the time of the crime. In a similar regard, the high court recognized that, as the culpability between a mentally retarded offender and a non-mentally retarded offender differed, so did the ability for a mentally retarded person differ in the ability to ascertain the deterrent impact of the death penalty. Id., 563 U.S. at 305, 122 S. Ct. at 2243-44.

Other indications that the United States Supreme Court intended the initial focus to be on whether the defendant was mentally retarded at the time of the offense include the recognition that mentally retarded defendants may be less able to give meaningful assistance to their counsel, they are more likely to give false confessions, they are poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes. Id., 563 U.S. at 320-321, 122 S. Ct. at 2252. It is without doubt that the factors leading to the ultimate determination in Atkins were centralized upon the characteristics of the mentally retarded offender at the time of the offense and prior to and during their trials, and not during the developmental period. See Pizzuto v. State, 202 P.3d 642, 653 (Ida. 2008).

The plain language of our statute, subsection (b), is consistent with the intent and purpose behind the United States Supreme Court's prohibition against the execution of mentally retarded offenders. See Strode, 232 S.W.3d at 11 ("When statutory language is clear and unambiguous, we apply the plain language in its normal and accepted use."). Each part and every word of a statute is presumed to have meaning and purpose and should not be construed as superfluous or as surplusage. State v. Black, 815 S.W.2d 166, 197 (Tenn. 1991). Thus, Petitioner has the burden of showing that, at the time of the murder, he was mentally retarded.

The post-conviction court determined that "Dr. Nichols' testimony established that Petitioner's IQ was at least 73 and potentially much higher." The post-conviction court noted that the only score reflecting a sub average intellectual functioning was the 1984 score of 70. The 1984 test was administered by the Memphis City School System, and, despite the fact that Petitioner scored an IQ of 70, the Memphis City School System did not make a finding of mental retardation. The trial court further determined that Petitioner's 1990 and 1993 test scores of 75 and 73 were more reliable.

Petitioner is correct in his statement that he was not re-evaluated regarding his mental retardation at the time of the offense in 1994. However, evaluations of Petitioner were completed in 1993 and 1990, both of which were times in Petitioner's adulthood. Petitioner asks this Court to ignore his IQ scores as an adult, both which would deem Petitioner eligible for the death penalty in this state. I decline to do so. I return to the focus of Atkins: the prohibition against the execution of offenders who were mentally retarded at the time of the offense. Petitioner's IQ scores resulting from tests administered closer in time to the 1994 murder indicate that Petitioner was not mentally retarded. There is no valid reason to ignore the 1990 and 1993 test scores, and/or to place more weight upon the 1984 test score. See generally Trotter v. State, 932 So.2d 1045, 1050 (Fla. 2006)(holding that there is no mandate that evaluations regarding mental retardation from the defendant's youth should be afforded more weight than evaluations from later in life). Our Legislature has mandated, in section 39-13-203, Tennessee Code Annotated, that IQ test scores are relevant in enforcing the prohibition against the execution of mentally retarded offenders. The courts of this state cannot ignore subsequent testing of an alleged mentally retarded offender. See generally Pruitt v. State, 834 N.E.2d 90, 106 (Ind. 2005)(subsequent IQ tests beyond developmental stage relevant to overall evaluation of offender). In the present case, Petitioner scored a 70 on an IQ test administered before he reached the age of 18; and received scores of 73 and 75 on tests administered after he reached the age of 18. The proof establishes that Petitioner failed to meet the Howell bright line mark of 70 for establishing mental retardation at the time of the offense. See, e.g., Hunter v. State, 243 S.W.3d 664, 671-72 (Tex. Crim. App. 2007)(defendant's IQ before 18 was below 70, and above 70 at age of 33; defendant failed to establish he was mentally retarded). I conclude that Petitioner has failed to establish by clear and convincing evidence that he was mentally retarded at the time of the offense. See T.C.A. § 39-13-203(b).

## COUNSEL'S REPRESENTATION REGARDING SENTENCING

A chronological procedural history of both the trial and the post-conviction proceedings is necessary to the analysis of Petitioner's claim of ineffective assistance of counsel. The crimes for which Petitioner was convicted occurred on January 2, 1994. He was indicted for the offenses on June 21, 1994. The trial began on November 14, 1994, and concluded with the jury's imposition of the death penalty on November 16, 1994. The Tennessee Supreme Court affirmed the murder conviction and sentence of death on April 13, 1998.

Petitioner filed his pro se petition for post-conviction relief on December 2, 1998. The Tennessee Office of the Post-Conviction Defender was appointed as counsel for Petitioner in these post-conviction proceedings on February 8, 1999. On April 13, 2000, fourteen months after being appointed as counsel for Petitioner, and sixteen months after the post-conviction proceedings were initiated, counsel for Petitioner filed an amended petition for post-conviction relief, comprised of extremely detailed allegations and consisting of 38 pages on "legal sized" paper.

The expert proof regarding mental impairments suffered by Petitioner consists of the testimony and reports of Dr. Jonathan Pincus, Dr. Pamela Auble, and Dr. Geraldine Bishop. At the time of the post-conviction hearing in April 2002, Dr. Pincus resided in Washington, D.C. and was

a professor of neurology at Georgetown University and also the chief of neurology at the Washington Veteran's Administration Medical Center. Dr. Auble was a self-employed neuropsychologist in Nashville, Tennessee. Dr. Bishop was a self-employed psychologist in Cordova (Shelby County), Tennessee.

Dr. Pincus first met Petitioner in December 2001, approximately three years after Petitioner filed his petition for post-conviction relief. Dr. Pincus requested that a magnetic resonance imaging (MRI) of Petitioner's brain be performed, which was done at Vanderbilt University Medical Center in Nashville, Tennessee, on February 1, 2002. According to Dr. Pincus, the MRI shows that Petitioner's brain is abnormal, specifically that it was shrunken. Dr. Pincus submitted his initial report on Petitioner's mental condition on December 17, 2001.

Dr. Auble met with Petitioner where he was incarcerated at Riverbend Maximum Security Institute in Nashville in April 2001, almost two and one-half years after Petitioner initiated the post-conviction proceedings. She submitted a report on Petitioner's mental impairments in June 2001, and submitted an addendum April 1, 2002.

Dr. Bishop interviewed Petitioner in February 2000, earlier than the other two expert witnesses, but still over a year after the post-conviction proceedings had begun and a year after the Post Conviction Defender had been appointed to represent Petitioner. Particularly noteworthy in Dr. Bishop's psychological assessment of Petitioner, submitted in June 2000, was that "[Petitioner] was alert, hypervigilant, and had rapid thought processes. [Petitioner] became agitated when I explained my purpose, stating that he would not permit a defense based on mental retardation, only one that said he was innocent." Dr. Bishop filed a supplemental psychological assessment pertaining to Petitioner on April 1, 2002, as a result of testing administered to Petitioner's aunt and uncle in March 2002.

A little more than two years prior to Petitioner's trial, this Court filed its opinion in Cooper v. State, 847 S.W.2d 521 (Tenn. Crim. App. 1992). In that case the State appealed the trial court's grant of post-conviction relief to a petitioner challenging his sentence of death. The trial court had held that the petitioner received ineffective assistance of counsel in the penalty phase, vacated the sentence of death, and ordered a new sentencing hearing. The central issue was trial counsel's deficient representation in investigating the petitioner's mental impairments in preparation of the penalty phase. Id. at 530. Our court affirmed the judgment of the trial court. In doing so our Court quoted with approval, and relied upon, the Commentary to A.B.A. Standards for Criminal Justice (2nd ed.), The Defense Function § 4-4.1:

> The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing. This cannot effectively be done on the basis of broad general emotional appeals or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself. Investigation is essential to fulfillment of these functions.

-4-

Id. at 531.

Clearly, there was a then recent opinion of this Court which could have guided trial counsel in Petitioner's case as to what documents should be actively sought and reviewed. Trial counsel did not obtain the school records and juvenile court records pertaining to Petitioner which would have alerted trial counsel to investigate the possibility of proving mental impairment of the Petitioner as a mitigating circumstance during the penalty phase of the trial. Nevertheless, even accepting, arguendo, deficient representation of counsel by this omission, I conclude that actual prejudice as required by Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984) was not established. As noted in Strickland, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id., 466 U.S. at 691, 104 S. Ct. at 2066. In Petitioner's case, the "error" for Strickland purposes was the failure to fully investigate evidence of mental impairment of Petitioner. Obviously, the "judgment" was a sentence of death.

Even almost six years after imposition of the death sentence, and after filing the pro se petition for post-conviction relief and the amended petition, Petitioner made it clear to Dr. Geraldine Bishop "that he would not permit a defense based on mental retardation, only one that said he was innocent." Significantly, Petitioner did not testify at the post-conviction hearing. Despite the mandate of Strickland that a petitioner must "affirmatively prove prejudice." Id., 466 U.S. at 693, 104 S. Ct. at 2067, there is no conclusive proof in the record that Petitioner will testify or allow proof that his alleged mental retardation or mental impairment should be considered a mitigating factor. The only indication in all the testimony and exhibits is that Petitioner would not want his mental impairment to be submitted as proof.

Furthermore, limitations of time and resources, while not conclusive in and of themselves, are factors which should be considered when deciding whether to set aside a conviction or sentence. See Strickland, 466 U.S. at 681, 104 S. Ct. 2052, 2061. While Strickland's notation of this factor was arguably in discussion of the "deficient performance" prong, there is no logical reason to exclude this factor from the "prejudice" prong. In Chandler v. United States, 218 F.3d 1305 (11th Cir. 2000), a federal death penalty case wherein the defendant/petitioner claimed he had received the ineffective assistance of counsel during the sentencing phase, the Court of Appeals for the Eleventh Circuit, sitting en banc, denied relief to the petitioner. In a footnote, the court stated that "courts must recognize that counsel does not enjoy the benefit of unlimited time and resources. Chandler, 13 F.3d at 1314, n.14 (citing Rogers v. Zant, 13 F.3d 384, 387 (11 Cir. 1994)). Every counsel is faced with a zero-sum calculation on time, resources, and defenses to pursue at trial." Id.

Dr. Bishop did not submit her psychological assessment of Petitioner until June 2000, one and one-half years after Petitioner's post-conviction proceeding was initiated. Dr. Auble submitted her initial report two and one-half years after Petitioner filed for post-conviction relief. Dr. Pincus, the neurologist from Washington, D.C., did not even meet with Petitioner until three years after the post-conviction petition had been filed. The record on appeal is without any indication of the costs necessary to obtain the services for examination, testimony, and travel by the expert witnesses. There is nothing in the appellate record to indicate: (1) that Dr. Pincus would have been available in 1994 when Petitioner's trial was held; (2) that funds would have been approved to obtain Dr.

Pincus' testimony; or (3) that the reports of all three experts could have been obtained within the normal period of time between indictment and trial, even in a capital case. There is not a "do over" ground for granting post-conviction relief. That is to say, the law does not require post-conviction relief to be granted simply because if a petitioner can have a second chance, a more voluminous record for mitigating proof can be submitted for a sentencing hearing. Furthermore, all three expert witnesses relied upon information obtained from Petitioner's various family members. The indication is that this source of information would not have been available to the experts in 1994. The post-conviction court made a specific finding that accredited "the testimony of trial counsel who stated that the defense team attempted to contact the Petitioner's family members but were told not to call back." For the foregoing reasons, I am constrained to conclude that Petitioner is not entitled to post-conviction relief and that the judgment of the post-conviction court should therefore be affirmed.

 

 

_____

THOMAS T. WOODALL, JUDGE
