# IN THE SUPREME COURT OF THE STATE OF IDAHO

## DOCKET NO. 47709

GERALD ROSS PIZZUTO, JR.,

    Petitioner-Appellant,

v.

STATE OF IDAHO,

    Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, December 2020 Term

Opinion Filed: February 3, 2021

Melanie Gagnepain, Clerk

---

Appeal from the District Court of the Second Judicial District of the State of Idaho, Idaho County. Jay Gaskill, District Judge.

The district court's order is <u>affirmed</u>.

Federal Defender Services of Idaho, Boise, for appellant. Jonah Horwitz argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent. Mark Olson argued.

---

BRODY, Justice.

This appeal concerns a motion to alter or amend a judgment entered in a post-conviction relief case. In 1985, Gerald Ross Pizzuto Jr. ("Pizzuto") murdered Berta Herndon and Delbert Herndon. Pizzuto was convicted of two counts of murder in the first degree, two counts of felony murder, one count of robbery, and one count of grand theft. He was sentenced to death for the murders. Between 1986 and 2003, Pizzuto filed five petitions for post-conviction relief. His fifth petition for post-conviction relief was predicated on the holding in *Atkins v. Virginia*, 536 U.S. 304 (2002), in which the Supreme Court of the United States held that the execution of an intellectually disabled person constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. In his fifth petition, Pizzuto asserted that his death sentence should be "reversed and vacated" because he is intellectually disabled. The district court summarily dismissed Pizzuto's petition. This Court, in *Pizzuto v. State (Pizzuto 2008)*, 146

1

Idaho 720, 202 P.3d 642 (2008), held that the district court did not err when it dismissed Pizzuto's fifth petition for post-conviction relief on the basis that Pizzuto had failed to raise a genuine issue of material fact supporting his claim that he was intellectually disabled at the time of the murders and prior to his eighteenth birthday.

Pizzuto pursued this same claim in a federal habeas corpus action. In 2016, the U.S. District Court for the District of Idaho ("federal district court") denied Pizzuto's successive petition for writ of habeas corpus after holding a four-day evidentiary hearing in 2010 and determining that Pizzuto had failed to demonstrate that he was intellectually disabled at the time of the murders and prior to his eighteenth birthday. *Pizzuto v. Blades* (*Pizzuto 2016*), No. 1:05-CV-00516-BLW, 2016 WL 6963030, at \*10–11 (D. Idaho Nov. 28, 2016), *aff'd*, 933 F.3d 1166 (9th Cir. 2019), and *aff'd sub nom. Pizzuto v. Yordy*, 947 F.3d 510 (9th Cir. 2019) (per curiam). In 2019, the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit") affirmed the federal district court's decision denying relief. *Pizzuto v. Yordy (Pizzuto 2019B)*, 947 F.3d 510, 535 (9th Cir. 2019) (per curiam), *cert. denied*, No. 19-8598, 2020 WL 6385786 (U.S. Nov. 2, 2020).

Although it affirmed the federal district court's decision denying Pizzuto's successive petition for writ of habeas corpus, the Ninth Circuit stated in dicta that its decision does not preclude Idaho courts from reconsidering whether Pizzuto was intellectually disabled at the time of the murders. Based on this dicta, Pizzuto filed a motion with the district court to alter or amend the judgment dismissing his fifth petition for post-conviction relief in accordance with Idaho Rule of Civil Procedure 60(b)(6) ("Motion"). The district court denied Pizzuto's Motion on January 6, 2020, on two bases. First, the district court held that Pizzuto's Motion was untimely. Second, the district court held that Pizzuto had not established unique and compelling circumstances necessary to justify relief under Idaho Rule of Civil Procedure 60(b)(6). Pizzuto timely appealed the district court's decision to this Court. Because the district court did not abuse its discretion in denying Pizzuto's Motion, we affirm the district court's decision.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Pizzuto murdered Berta Herndon and her nephew, Delbert Herndon, in 1985. *Pizzuto 2008*, 146 Idaho at 723, 202 P.3d at 645. Pizzuto was convicted of two counts of murder in the first degree, two counts of felony murder, one count of robbery, and one count of grand theft. *Id.* He was sentenced to death for the murders. *Id.* The facts surrounding Pizzuto's convictions and

sentences are summarized in *State v. Pizzuto (Pizzuto 1991)*, 119 Idaho 742, 748–50, 810 P.2d 680, 686–88 (1991).

After Pizzuto was convicted and sentenced, he filed five petitions for post-conviction relief between 1986 and 2003. *Pizzuto 2008*, 146 Idaho at 723, 202 P.3d at 645. Pizzuto's fifth petition for post-conviction relief—which was filed in 2003—is relevant to this appeal. Pizzuto's fifth petition was predicated on the holding in *Atkins v. Virginia*, where the Supreme Court of the United States ruled that the execution of an intellectually disabled person constituted cruel and unusual punishment in violation of the Eighth Amendment. *Id.*; *Atkins*, 536 U.S. at 321. Based on the holding in *Atkins*, Pizzuto sought to "reverse and vacate" his death sentence due to his alleged intellectual disability. *Pizzuto 2008*, 146 Idaho at 723, 202 P.3d at 645. Claims of this nature are commonly referred to as "*Atkins* claims."

During the course of the proceedings pertaining to his *Atkins* claim, Pizzuto filed a motion with the district court seeking to be transported to a medical facility for additional testing relating to his alleged intellectual disability. *Id.* at 733, 202 P.3d at 655. However, Pizzuto never filed a notice to set a hearing on his motion. *Id.* Pizzuto then moved for summary judgment in 2005 without pursuing the motion to be transported to a medical facility for additional testing. *Id.*

The district court dismissed Pizzuto's fifth petition for post-conviction relief, in part, on the basis that Pizzuto had failed to raise a genuine issue of material fact supporting his claim that he was intellectually disabled at the time of the murders and prior to his eighteenth birthday. *Id.* at 724, 202 P.3d at 646. In 2008, this Court affirmed the district court's decision denying post-conviction relief. *Id.* at 735, 202 P.3d at 657. This Court concluded that Pizzuto had not met his burden of showing that he was intellectually disabled. *Id.* at 733, 202 P.3d at 655. More specifically, this Court concluded that Pizzuto had not shown that he had an intelligence quotient (IQ) of 70 or below at the time of the murders and prior to his eighteenth birthday:

> Pizzuto had the burden of showing that at the time of his murders he was mentally retarded as defined in Idaho Code § 19-2515A(1)(a) and that his mental retardation occurred prior to his eighteenth birthday. To prevent summary judgment from being granted to the State, he had to create a genuine issue of material fact on each element of his claim. A mere scintilla of evidence or only slight doubt is not sufficient to create a genuine issue of material fact. One requirement of proving mental retardation is that Pizzuto had an IQ of 70 or below at the time of the murders and prior to his eighteenth birthday. He did not offer any expert opinion showing that he did. He likewise did not offer any expert opinion stating that he was mentally retarded at the time of the murders or prior to

age eighteen. The district court did not err in granting summary judgment to the State.

*Id.* (internal citation omitted). We note that mental health experts now employ the term "intellectual disability" in place of "mental retardation." *See, e.g.*, American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 33 (5th ed. 2013). We use the term "intellectual disability" except when quoting prior opinions or statutes.

In 2014—well after this Court issued its ruling in *Pizzuto 2008*, but while Pizzuto's successive petition for writ of habeas corpus was still pending in the federal courts—the Supreme Court of the United States decided *Hall v. Florida*, 572 U.S. 701 (2014). In *Hall*, the Supreme Court of the United States scrutinized a Florida law that was similar to Idaho Code section 19–2515A. *See id.* at 704. Under Florida's statute, a prisoner with an IQ score of 70 or below was deemed to be intellectually disabled. *Id.* If, however, a prisoner had an IQ score above 70, "all further exploration of intellectual disability [was] foreclosed." *Id.* Because the statute did not recognize that IQ tests have a standard error of measurement (SEM) of five points, the Supreme Court of the United States held that Florida's "rigid rule . . . creates an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional." *Id.*

As previously noted, Pizzuto also filed a successive petition for writ of habeas corpus with the federal district court. *Pizzuto 2016,* 2016 WL 6963030, at \*1. Pizzuto's petition was based on the same *Atkins* claim that this Court ruled on in *Pizzuto 2008. Id.* The federal district court denied Pizzuto's petition, concluding that Pizzuto was not entitled to relief under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) or under de novo review. *Id.* at \*6. "The [c]ourt concludes—under both AEDPA and de novo review—that Pizzuto has failed to satisfy the first and third prongs of the intellectual disability analysis. Thus, Pizzuto is not entitled to relief on his *Atkins* claim." *Id.*

Under de novo review, a federal district court reviews a petitioner's habeas corpus claim anew and may, under certain circumstances, consider evidence outside the state court's record. *Id.* at \*4. (citing *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014)). Thus, as part of its de novo review, the federal district court conducted a four-day hearing in 2010 and considered testimony from multiple experts. See *id.* at \*10. The hearing resulted in conflicting evidence concerning Pizzuto's alleged intellectual disability. *Id.* More specifically, the federal district court "was presented with three IQ scores: one below 70, one above 90, and one in the grey area between 71 and 75." *Id.* After evaluating the evidence, the federal district court concluded that

4

Pizzuto did not suffer from "significant subaverage intellectual functioning" at the time of the murders and prior to his eighteenth birthday. *Id.* In other words, after evaluating the expert testimony presented by Pizzuto, it determined that Pizzuto was not intellectually disabled at the time of the murders and prior to his eighteenth birthday.

In August 2019, the Ninth Circuit affirmed the federal district court's denial of Pizzuto's successive petition for writ of habeas corpus in *Pizzuto v. Blades* (*Pizzuto 2019A*), 933 F.3d 1166 (9th Cir. 2019). *Pizzuto 2019A* was superseded in December 2019, however, by *Pizzuto 2019B* after the Ninth Circuit denied Pizzuto's request for a rehearing en banc. *Pizzuto 2019B*, 947 F.3d at 514. *Pizzuto 2019B*, which did not include any substantive changes to the Ninth Circuit's previous decision in *Pizzuto 2019A*, also upheld the federal district court's denial of Pizzuto's successive petition for writ of habeas corpus. *Pizzuto 2019B*, 947 F.3d at 514–15.

> Because the record does not establish that the state court's adjudication of Pizzuto's *Atkins* claim resulted in a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," habeas relief may not be granted.

*Id.* (quoting 28 U.S.C. § 2254(d)).

Based on its holding, the Ninth Circuit determined it was unnecessary to review Pizzuto's *Atkins* claim de novo. *Id.* at 534. Consequently, the Ninth Circuit did "not address whether Pizzuto is intellectually disabled or whether his execution would violate the Eighth Amendment." *Id.* However, the Ninth Circuit, in dicta, stated, "Our decision . . . does not preclude the Idaho courts from reconsidering those questions in light of intervening events." *Id.*

Pizzuto viewed this dicta as an "invitation" from the Ninth Circuit to file a motion to alter or amend the judgment dismissing his fifth petition for post-conviction relief under Idaho Rule of Civil Procedure 60(b)(6). Thus, Pizzuto filed his Motion on September 25, 2019—forty-two days after the Ninth Circuit issued *Pizzuto 2019A*. He also filed a memorandum in support of his Motion that included several exhibits, including a neurocognitive evaluation prepared by Ricardo Weinstein, Ph.D., in 2009; an adaptive behavior report prepared by James R. Patton, Ed.D., in 2009; and, a declaration from James Merikangas, M.D., from 2009.

In response to Pizzuto's Motion and supporting memorandum, the State submitted evidence showing that, in 1996, Pizzuto had a verbal IQ score of 91, a performance IQ score of 94, and a full scale IQ score of 92. This evidence was not in the record when this Court decided

5

*Pizzuto 2008*. The State also submitted a 2010 report prepared by Roger Moore, Ph.D., showing that Pizzuto was not intellectually disabled.

The district court issued its memorandum opinion on January 6, 2020. The district court denied Pizzuto's Motion on two grounds. First, the district court held that Pizzuto's Motion was untimely. Second, the district court held that Pizzuto had failed to establish unique and compelling circumstances that justify relief under Idaho Rule of Civil Procedure 60(b)(6). Pizzuto timely appealed the district court's decision to this Court. Additionally, Pizzuto filed a separate motion with this Court to recall the remittitur associated with *Pizzuto 2008*, which was denied.

## II. STANDARD OF REVIEW

The decision to grant or deny a motion seeking relief under Idaho Rule of Civil Procedure 60(b)(6) is a discretionary one. *In Re SRBA Case No. 39576 Subase No. 37-00864*, 164 Idaho 241, 248, 429 P.3d 129, 136 (2018) ("Rule 60(b)(6) presents a discretionary decision for the trial court."). Thus, when a trial court rules on a motion seeking relief under Idaho Rule of Civil Procedure 60(b)(6), the decision is reviewed on appeal for abuse of discretion. *Id.* (citing *Berg v. Kendall*, 147 Idaho 571, 576, 212 P.3d 1001, 1006 (2009)). When reviewing a trial court's decision for abuse of discretion, this Court assesses "[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018) (citing *Hull v. Giesler*, 163 Idaho 247, 250, 409 P.3d 827, 830 (2018)).

Pizzuto asserts "that the standard of review here should be de novo, since the district court's ruling was based on strictly legal determinations about what situations legitimately call for relief under I.R.C.P. 60(b), not on contested factual assessments." Pizzuto cites *Eby v. State*, 148 Idaho 731, 228 P.3d 998 (2010), in support of his argument, but Pizzuto's reliance on *Eby* is misplaced. In *Eby*, this Court stated, "The *interpretation* of the Idaho Rules of Civil Procedure is a matter of law over which this Court has free review." 148 Idaho at 734, 228 P.3d at 1001 (emphasis added). We went on to state, however, that "[t]he decision to grant or deny a motion under I.R.C.P. 60(b) is committed to the discretion of the trial court." *Id.*

> A trial court's decision whether to grant relief pursuant to I.R.C.P. 60(b) is
> reviewed for abuse of discretion. The decision will be upheld if it appears that the

6

trial court (1) correctly perceived the issue as discretionary, (2) acted within the boundaries of its discretion and consistent with the applicable legal standards, and (3) reached its determination through an exercise of reason. A determination under Rule 60(b) turns largely on questions of fact to be determined by the trial court. Those factual findings will be upheld unless they are clearly erroneous. If the trial court applies the facts in a logical manner to the criteria set forth in Rule 60(b), while keeping in mind the policy favoring relief in doubtful cases, the court will be deemed to have acted within its discretion.

*Id.* (quoting *Waller v. State, Dep't of Health and Welfare*, 146 Idaho 234, 237–38, 192 P.3d 1058, 1061–62 (2008)).

In *Eby*, this Court addressed two issues concerning Idaho Rule of Civil Procedure 60(b)(6). The first issue involved "the relationship between I.R.C.P. 40(c) and I.R.C.P. 60(b)." *Id.* That issue presented a question of law, and this Court decided the matter by exercising free review. *Id.* at 736, 228 P.3d at 1003. The second issue addressed in *Eby*, however, involved the district court's decision to deny Eby's motion for relief under Idaho Rule of Civil Procedure 60(b)(6). *Id.* In reviewing that issue, we expressly utilized an abuse of discretion standard of review. *Id.*

Turning to the case at bar, this Court is tasked with reviewing the district court's discretionary decision denying Pizzuto's Motion. Consequently, the correct standard of review is our well-established abuse of discretion test. *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194.

### III. ANALYSIS

Pizzuto asserts the district court erred when it denied his Motion for two reasons. First, Pizzuto argues the district court erred when it denied his Motion as being untimely. Second, Pizzuto contends the district court erred when, in the alternative, it denied his Motion because Pizzuto failed to show unique and compelling circumstances necessary to justify relief under Idaho Rule of Civil Procedure 60(b)(6). We address both issues in turn. Before doing so, however, we address two preliminary matters that impact our subsequent analysis: (A) the validity of this Court's ruling in *Pizzuto 2008*; and, (B) the federal district court's determination that Pizzuto was not intellectually disabled at the time of the murders and prior to his eighteenth birthday.

### A. *Pizzuto 2008* was correctly decided by this Court.

Because it informs our analysis below, we begin by examining this Court's decision in *Pizzuto 2008*. We conclude that *Pizzuto 2008* was correctly decided based on the plain language of Idaho Code section 19-2515A and the Supreme Court of the United States' holding in *Atkins*.

7

In *Atkins*, the Supreme Court of the United States held that the execution of a murderer who was intellectually disabled constituted cruel and unusual punishment in violation of the Eighth Amendment. *Atkins*, 536 U.S. at 321. In reaching its decision, the Supreme Court referenced clinical definitions promulgated by the American Association on Mental Retardation and the American Psychiatric Association when discussing intellectual disability. *See id.* at 308 n.3. The Supreme Court did not, however, adopt these clinical definitions. Rather, it left it to each state to develop appropriate mechanisms to enforce the rule announced in *Atkins*. *Id.* at 317. Stated differently, the Supreme Court did not adopt a definition of intellectual disability; that task was left to the states. *See Shoop v. Hill*, 139 S. Ct. 504, 507 (2019) ("*Atkins* gave no comprehensive definition of 'mental retardation' for Eighth Amendment purposes."); *see also Bobby v. Bies*, 556 U.S. 825, 831 (2009) (stating that *Atkins* did not provide "definitive procedural or substantive guides" for determining when a person is intellectually disabled); *Ybarra v. Filson*, 869 F.3d 1016, 1024 (9th Cir. 2017) (stating that *Atkins* did not include definitive procedural or substantive guides to determine who qualifies as intellectually disabled).

In response to *Atkins*, the Idaho legislature adopted Idaho Code section 19-2515A, which includes the following definitions:

> (a) "Mentally retarded" means significantly subaverage general intellectual functioning that is accompanied by significant limitations in adaptive functioning in at least two (2) of the following skill areas: communication, self-care, home living, social or interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety. The onset of significant subaverage general intelligence functioning and significant limitations in adaptive functioning must occur before age eighteen (18) years.

> (b) "Significantly subaverage general intellectual functioning" means an intelligence quotient of seventy (70) or below.

I.C. § 19-2515A(a)–(b). These definitions generally conform to the clinical standards in place at the time *Atkins* was decided. *See Atkins*, 536 U.S. at 308 n.3.

> The American Association on Mental Retardation (AAMR) defines mental retardation as follows: "Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992).

The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70. *Id.*, at 42–43.

*Id.*

This Court, in *Pizzuto 2008*, appropriately characterized Idaho Code section 19-2515A as creating a three-prong test that must be satisfied in order to show that an individual is intellectually disabled:

[T]he statutory definition of "mentally retarded" requires proof of three elements: (1) an intelligence quotient (IQ) of 70 or below; (2) significant limitations in adaptive functioning in at least two of the ten areas listed; and (3) the onset of the offender's IQ of 70 or below and the onset of his or her significant limitations in adaptive functioning both must have occurred before the offender turned age eighteen.

*Pizzuto 2008*, 146 Idaho at 729, 202 P.3d at 651. This Court also correctly noted that "the legislature did not require that the IQ score be within five points of 70 or below" because of the standard error of measurement. *Id.* Rather, the legislature required an IQ score of 70 or below. *Id.* The requirement concerning an IQ score of 70 or below was not inconsistent with *Atkins* at the time this Court issued its decision in *Pizzuto 2008*. As previously discussed, *Atkins* did not adopt specific clinical standards; instead, the Supreme Court of the United States expressly left it to the states to develop mechanisms to comply with its ruling. *Atkins*, 536 U.S. at 317.

In deciding *Pizzuto 2008*, this Court correctly noted that Pizzuto had the burden of showing that he "had an IQ of 70 or below at the time of the murders and prior to his eighteenth birthday." *Pizzuto 2008*, 146 Idaho at 733, 202 P.3d at 655. Nevertheless, the record before this Court included only one IQ score for Pizzuto—a verbal IQ score of 72. *Id.* at 729, 202 P.3d at 651. Furthermore, Pizzuto did not offer any expert opinion showing he had an IQ of 70 or below at the time of the murders and prior to his eighteenth birthday. *Id.* at 733, 202 P.3d at 655. Therefore, because Pizzuto did not meet his burden of proof, this Court held that the district court did not err in granting summary judgment in favor of the State. *Id.*

9

In sum, this Court's ruling in *Pizzuto 2008* was in accord with the requirements set forth by the legislature in Idaho Code section 19-2515A. Moreover, this Court's decision was not inconsistent with the holding in *Atkins*. Therefore, we are satisfied that *Pizzuto 2008* was correctly decided based on the law at that time.

**B. After conducting a four-day evidentiary hearing, the federal district court determined Pizzuto was not intellectually disabled at the time of the murders and prior to his eighteenth birthday.**

Pizzuto contends that this Court "ought to take into consideration the substantial evidence that [he] is intellectually disabled and order a hearing so the district court can fully assess such evidence." The federal district court, when considering Pizzuto's successive petition for writ of habeas corpus which presented the same legal and factual issues which Pizzuto now contends justify relief here, conducted a full evidentiary hearing to determine if Pizzuto was intellectually disabled. When the federal district court ruled on Pizzuto's petition, it expressly considered *Hall* and the standard error of measurement (SEM). *Pizzuto 2016*, 2016 WL 6963030, at *5 n.4. The federal district court also considered the "Flynn effect," which accounts for the increase in a population's mean IQ score over time. *Id.* After completing its de novo review, the federal district court determined "that Pizzuto has not shown that he suffered from significantly subaverage intellectual functioning at the time of the crime, or that any subaverage intellectual functioning existed prior to Pizzuto's eighteenth birthday." *Id.* at *11. The federal district court observed that, even after making adjustments for the SEM and the Flynn effect, Pizzuto was still not "close to the threshold for significantly subaverage general intellectual functioning." *Id.* at *5 n.4.

The federal district court discussed the evidentiary hearing and its reasoning in detail in *Pizzuto v. Blades (Pizzuto 2012)*, No. 1:05-CV-516-BLW, 2012 WL 73236, at *13–15 (D. Idaho Jan. 10, 2012), *aff'd*, 729 F.3d 1211 (9th Cir. 2013), *opinion withdrawn*, 758 F.3d 1178 (9th Cir. 2014), and *vacated*, 758 F.3d 1178 (9th Cir. 2014), and *order confirmed*, No. 1:05-CV-00516-BLW, 2016 WL 6963030 (D. Idaho Nov. 28, 2016). We are mindful that *Pizzuto 2012* was vacated by the Ninth Circuit after the Supreme Court of the United States decided *Hall* so that the federal district court could consider the implications of *Hall*, if any, on Pizzuto's successive petition for writ of habeas corpus. *Pizzuto v. Blades (Pizzuto 2014)*, 758 F.3d 1178, 1179 (9th Cir. 2014). Nevertheless, the federal district court expressly incorporated the analysis from

10

*Pizzuto 2012* into its analysis in *Pizzuto 2016*. *Pizzuto 2016*, 2016 WL 6963030, at \*11. Thus, the analysis in *Pizzuto 2012* is pertinent.

After the federal district court completed its four-day evidentiary hearing, there were three conflicting IQ scores in the record:

> Dr. Emery's 1985 verbal score of 72 on the WAIS–R; a full scale score of 92 on the WAIS–R, taken as part of Dr. Beaver's 1996 neuropsychiatric testing (91 verbal, 94 performance); and, most recently, a full scale score of 60 on the WAIS–IV from Dr. Ricardo Weinstein during a 2009 evaluation.

*Pizzuto 2012*, 2012 WL 73236, at \*13. The federal district court determined that the 2009 IQ score of 60 was entitled to the least weight for two reasons. First, "Dr. Weinstein tested Pizzuto 35 years after his 18th birthday and conceded that 'one can assume, everything being the same, that the accuracy [of an IQ score] would be better the closer [to age 18].' " *Id.* at \*14 (brackets in original). Second, the federal district court found the testimony of the State's expert "regarding Pizzuto's incentive to underperform during the most recent testing to be credible and persuasive." *Id.*

The federal district court determined the 1985 verbal score of 72 was entitled to more weight than the 2009 IQ score because it was closer in time to Pizzuto's eighteenth birthday. *Id.* Nevertheless, the federal district court noted that the 1985 score had serious flaws. *Id.* First, "Dr. Emery did not record a full scale score and has since disposed of his raw data." *Id.* Next, "Pizzuto's drug use and other neurological problems may have affected his cognitive functioning at the time." *Id.* And finally, "Dr. Emery testified at the sentencing hearing that Pizzuto probably had more 'native intelligence' than the verbal score indicated." *Id.* For those reasons, the federal district court did "not entirely discount Dr. Emery's score as providing some data on the issue, but it f[ound] the score to be a low estimation of Pizzuto's full intellectual functioning before he turned 18." *Id.*

The federal district court assigned the most weight to the 1996 IQ score of 92. *Id.* at \*15. "Dr. Beaver testified at the evidentiary hearing that while Pizzuto did poorly on a few other tests in the battery, particularly those that assessed memory and recall, he had no reason to question the validity of the scores on the WAIS–R." *Id.* Further, the federal district court was unpersuaded by Pizzuto's argument that he may "have been motivated to perform better than he otherwise would have because Dr. Beaver's 'very attractive' female psychometrician administered the test." *Id.* The federal district court found Pizzuto's theory to be "wholly unsupported." *Id.*

In sum, the federal district court determined Pizzuto's IQ score was most likely somewhere in the 80s—well above the IQ score necessary to show Pizzuto was intellectually disabled at the time of the murders and prior to his eighteenth birthday. *Id.* at *16.

> The [c]ourt . . . finds that Pizzuto's intellectual functioning was likely higher than the Emery verbal score of 72 indicates but lower than the Beaver full scale score of 92. This would place him approximately one standard deviation below the mean (about 15 points), most likely somewhere in the 80s, but the [c]ourt need not determine a precise numerical score. It is sufficient to say that Pizzuto has not proven by a preponderance of the evidence that his general intellectual functioning at the relevant time was significantly subaverage; that is, that he had an IQ of 70 or below.

*Id.* at *16. Stated differently, Pizzuto, after a four-day evidentiary hearing, failed to show under *Atkins* or *Hall* "that he suffered from significantly subaverage intellectual functioning at the time of the crime, or that any subaverage intellectual functioning existed prior to Pizzuto's eighteenth birthday." *Pizzuto 2016*, 2016 WL 6963030, at *11.

The federal district court's holding in *Pizzuto 2016* is not binding on this Court, of course. *See State v. McNeely*, 162 Idaho 413, 415, 398 P.3d 146, 148 (2017) (quoting *Dan Wiebold Ford, Inc. v. Universal Comput. Servs,, Inc.*, 142 Idaho 235, 240, 127 P.3d 138, 143 (2005)) (stating that state courts are not bound by decisions of lower federal courts). Nonetheless, the federal district court's analysis in *Pizzuto 2012* and *Pizzuto 2016* causes us to question how much weight, if any, should be assigned to the Ninth Circuit's dicta in *Pizzuto 2019B*.

## C. The district court did not err when it denied Pizzuto's Motion as being untimely.

The district court denied Pizzuto's Motion, in part, because it was untimely. The district court found that Pizzuto was aware of *Hall v. Florida*, 572 U.S. 701 (2014), well before the Ninth Circuit's decision was issued in 2019. Thus, the district court held that Pizzuto's Motion, which was filed five years after the issuance of *Hall*, was untimely.

Pizzuto asserts the district court erred when it utilized *Hall* as the triggering event for determining whether his Motion was timely. Rather, he contends the triggering event was the Ninth Circuit's opinion, which was originally issued on August 14, 2019, as *Pizzuto 2019A*, and reissued on December 31, 2019, as *Pizzuto 2019B*. Because Pizzuto filed his Motion on September 25, 2019, which was within forty-two days of the Ninth Circuit's issuance of *Pizzuto 2019A*, he contends the Motion was timely. We disagree.

12

Under Idaho Rule of Civil Procedure 60(b)(6), a court may relieve a party from a final judgment for any reason that justifies relief. "Although the court is vested with broad discretion in determining whether to grant or deny a Rule 60(b)[(6)] motion, its discretion is limited and may be granted only on a showing of 'unique and compelling circumstances' justifying relief." *Eby*, 148 Idaho at 736, 228 P.3d at 1003 (brackets omitted) (quoting *Miller v. Haller*, 129 Idaho 345, 349, 924 P.2d 607, 611 (1996)). Consequently, appellate courts infrequently grant relief under this rule. *See Dixon v. State*, 157 Idaho 582, 587, 338 P.3d 561, 566 (Ct. App. 2014) (citing *Berg v. Kendall*, 147 Idaho 571, 578, 212 P.3d 1001, 1008 (2009)). Further, a motion under Idaho Rule of Civil Procedure 60(b)(6) must be made within a "reasonable time." I.R.C.P. 60(c). "What constitutes a reasonable time depends upon the facts in each individual case." *Viafax Corp. v. Stuckenbrock*, 134 Idaho 65, 70, 995 P.2d 835, 840 (Ct. App. 2000) (citation omitted). "The question of what is a reasonable time under Rule 60(b) is a question of fact to be resolved by the trial court." *Id.* at 71, 995 P.2d at 841 (citing *Davis v. Parrish*, 131 Idaho 595, 597, 961 P.2d 1198, 1200 (1998)).

Here, the district court initially observed that if Pizzuto had pursued a sixth successive petition for post-conviction relief—instead of a motion for relief under Idaho Rule of Civil Procedure 60(b)(6)—he would have been required to file the petition within forty-two days after his claim was known or reasonably should have been know. The district court then determined that "Pizzuto's claims should have been reasonably known following the issuance of *Hall* in 2014. There are no extraordinary circumstances that prevented Pizzuto from filing a successive claim within 42 days of the issuance of *Hall*." While acknowledging that Pizzuto's Motion is not a successive petition for post-conviction relief, the district court determined that Pizzuto's Motion was not made within a reasonable time. The district court explained its reasoning as follows:

> Having reviewed the federal as well as state record with respect to Pizzuto's intellectual disability claims, it is clear that Pizzuto was aware of the developments from *Hall, Brumfield*, and *Moore I*, as well as the updates to the [American Association on Intellectual and Developmental Disabilities] and the American Psychiatric Association clinical standards well before the Ninth Circuit issued [*Pizzuto 2019A*]. Issues arising from *Hall* and the AAIDD and APA clinical standards were addressed and developed by Pizzuto's counsel when Judge Winmill considered [*Pizzuto 2016*]. Pizzuto's decision to proceed through the federal courts and delay on seeking redress through the Idaho state courts is not a reasonable basis for waiting five years to move to reopen the fifth petition for post-conviction relief. . . . Clearly, Pizzuto was aware of the developments

13

resulting from *Atkins*, and strategically he decided to pursue remedy through the federal system. This [c]ourt is not persuaded that this decision of strategy equates to reasonableness which would allow Pizzuto to delay in filing either a successive petition for post-conviction relief or a motion to reopen the fifth petition pursuant to I.R.C.P. 60(b)(6).

This Court reviews the district court's decision to dismiss Pizzuto's Motion for an abuse of discretion. *In Re SRBA*, 164 Idaho at 248, 429 P.3d at 136; *Eby*, 148 Idaho at 734, 228 P.3d at 1001. Pizzuto does not assert that the district court failed to perceive the issue as one of discretion, nor does he contend the district court acted outside the boundaries of its discretion. Thus, there is no need to dwell on those issues here. With respect to the third prong of the *Lunneborg* test described above, the district court acted in accordance with the applicable legal standards. The district court properly identified the applicable legal standards—including Idaho Rule of Civil Procedure 60(b)(6) and relevant case law—and it acted in a manner consistent with those standards. Finally, the district court reached its decision by the exercise of reason. First, the district court determined that *Hall* was the predicate for Pizzuto's Motion for the reasons set forth above. Next, the district court found that Pizzuto was aware of *Hall* and its progeny—as well as the updates to the American Association on Intellectual and Developmental Disabilities and American Psychiatric Association clinical standards—years before the Ninth Circuit issued its opinion in 2019. And finally, the district court reasoned that it was not reasonable for Pizzuto to wait several years after *Hall* was decided before filing his Motion. Thus, the district court held that Pizzuto's Motion was untimely.

Based on the foregoing, we conclude that the district court did not abuse its discretion when it denied Pizzuto's Motion as being untimely.

**D. The district court did not err when it denied Pizzuto's Motion because he failed to show unique and compelling circumstances.**

The district court denied Pizzuto's Motion, in the alternative, on the basis that Pizzuto had failed to show unique and compelling circumstances necessary to justify relief under Idaho Rule of Civil Procedure 60(b)(6). First, the district court determined that, notwithstanding the dicta in *Pizzuto 2019B*, the record in this case does not rise to the level of unique and compelling circumstances. Second, the district court also determined that Pizzuto's claim concerning his attorney's alleged negligence during Pizzuto's previous post-conviction proceedings did not constitute unique and compelling circumstances. We examine both issues in turn.

14

**1. Dicta in the Ninth Circuit's opinion does not establish unique and compelling circumstances necessary to justify relief under Idaho Rule of Civil Procedure 60(b)(6).**

Pizzuto asserts the district court erred when it denied his Motion after determining that the Ninth Circuit's opinion did not establish unique and compelling circumstances necessary to justify relief under Idaho Rule of Civil Procedure 60(b)(6). Pizzuto contends the Ninth Circuit's decision in *Pizzuto 2019B* reveals that this Court's treatment of Pizzuto's *Atkins* claim in 2008 was erroneous. To support his argument, Pizzuto relies extensively on the Ninth Circuit's discussion concerning the clinical standards that existed in 2008. The Ninth Circuit's discussion concerning clinical standards is instructive:

> Pizzuto is correct that the Idaho Supreme Court's application of a "hard IQ-70 cutoff" was inconsistent with the clinical definitions in place at the time of the state court's decision. The [fourth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)], adopted in 2000, defined the diagnostic criteria for intellectual disability as:
>
> > A. Significantly subaverage intellectual functioning: an IQ of *approximately* 70 or below on an individually administered IQ test (for infants, a clinical judgment of significantly subaverage intellectual functioning).
> >
> > B. Concurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group) in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.
> >
> > C. The onset is before age 18 years.
>
> DSM-IV at 49 (emphasis added). This standard does not require an IQ of 70 or below; it requires "an IQ of *approximately* 70 or below." *Id.* (emphasis added). Under the DSM-IV, therefore, "it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior." *Id.* at 41–42.
>
> The 10th edition of the AAMR manual, adopted in 2002, defined intellectual disability as follows:
>
> > Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.
>
> AAMR, Mental Retardation: Definition, Classification, and Systems of Supports 8 (10th ed. 2002). Under the intellectual functioning prong, "[t]he criterion for

15

diagnosis is *approximately* two standard deviations below the mean, considering the standard error of measurement for the specific assessment instrument used and the instrument's strengths and weaknesses." *Id.* at 37 (emphasis added). "In effect, this expands the operational definition of mental retardation to 75, and that score of 75 may still contain measurement error." *Id.* at 59.

In contrast to these clinical standards, the Idaho Supreme Court required an offender to establish an IQ of 70 or below under all circumstances, regardless of the offender's deficits in adaptive functioning. . . . In doing so, the [Idaho Supreme Court] failed to recognize that "it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior." DSM-IV at 41–42. Nor did the [Idaho Supreme Court] consider whether Pizzuto satisfied this standard. The [Idaho Supreme Court's] decision, therefore, was contrary to the clinical definitions in place at the time.

*Pizzuto 2019B*, 947 F.3d at 525–26 (emphasis in original; footnote omitted).

The Ninth Circuit then went on to note, however, that, in deciding *Atkins*, the Supreme Court of the United States did not adopt the definitions above, nor did it require states to follow them. *Id.* at 527. "At the time of the [Idaho Supreme Court's] decision in 2008, it was not yet apparent that states were required to define intellectual disability in accordance with these prevailing clinical definitions." *Id.* Consequently, the Ninth Circuit held that "the Idaho Supreme Court's application of a 'hard IQ-70 cutoff' was not an 'unreasonable application' of *Atkins*" under the AEDPA. *Id.*

Pursuant to Idaho Rule of Civil Procedure 60(b)(6), a court may relieve a party from a final judgment for any reason that justifies relief. A trial court exercises discretion when determining whether to grant or deny a motion under Idaho Rule of Civil Procedure 60(b)(6). *Eby*, 148 Idaho at 736, 228 P.3d at 1003. The trial court's discretion is limited, however, and such a motion may be granted only if the movant establishes unique and compelling circumstances justifying relief. *Id.* at 736, 228 P.3d at 1003.

Here, the district court began its analysis by noting that the Ninth Circuit's dicta gave it pause. The district court also acknowledged that "an evidentiary hearing has not been held before a state court to determine whether Pizzuto's execution would violate the Eighth Amendment." The district court was mindful, however, that the federal district court had conducted such an evidentiary hearing to determine if Pizzuto was intellectually disabled at the time of the murders and prior to turning eighteen. "While Pizzuto has not had an evidentiary hearing before a state court, the record in this matter also includes the federal habeas review. Judge Winmill found that

16

Pizzuto failed to prove his IQ was 70 or below, and also that his IQ was 75 or below before he turned 18."

Based on its analysis, the district court determined that Pizzuto had failed to establish unique and compelling circumstances to support his Motion to reopen his fifth petition for post-conviction relief.

> This [c]ourt does not believe the record in this case rises to the level of unique and compelling circumstances as contemplated by I.R.C.P. 60(b)(6). From reviewing the record, it appears this issue was brought under [Idaho Rule of Civil Procedure 60(b)(6)] because a sixth successive petition would not have been timely in this matter. It is not appropriate to allow a catchall provision to circumvent the parameters of the [Uniform Post-Conviction Procedure Act]. While the [c]ourt does not decide this issue lightly, considering the seriousness of the matter and also the statements of the Ninth Circuit Court of Appeals, the record as a whole does not support reopening the fifth petition for post-conviction relief pursuant to the catchall provision of I.R.C.P. 60(b).

Hence, the district court denied Pizzuto's Motion.

The district court did not abuse its discretion when it denied Pizzuto's Motion after determining the Ninth Circuit's decision does not establish unique and compelling circumstances necessary to grant relief. Pizzuto does not contend that the district court failed to perceive the issue as one of discretion, nor does he contend the district court acted outside the boundaries of its discretion. Further, in assessing whether Pizzuto had established unique and compelling circumstances, the district court acted consistently with the applicable legal standards. The district court relied on Idaho Rule of Civil Procedure 60(b)(6) and applicable case law to conduct its analysis, and the district court acted in accordance with the legal standards. Finally, the district court reached its decision by the exercise of reason by considering the relationship between the dicta in the Ninth Circuit's opinion, the federal district court's findings and conclusions in *Pizzuto 2016*, the Uniform Post-Conviction Procedure Act, Idaho Rule of Civil Procedure 60(b)(6), and this Court's ruling in *Pizzuto 2008*. The findings and conclusions of the federal district court in *Pizzuto 2016*, in particular, call into question the relevance of the dicta in *Pizzuto 2019B*, since the federal district court determined that Pizzuto had failed to establish that he was intellectually disabled at the time of the murders and prior to his eighteenth birthday.

Based on the foregoing, we conclude that the district court did not abuse its discretion when it determined that the dicta in *Pizzuto 2019B* was insufficient to establish unique and

compelling circumstances necessary to justify relief under Idaho Rule of Civil Procedure 60(b)(6).

### 2. Pizzuto's assertions concerning his attorney's alleged negligence do not rise to the level of unique and compelling circumstances.

To determine whether Pizzuto established unique and compelling circumstances necessary to justify relief under Idaho Rule of Civil Procedure 60(b)(6), the district court also evaluated Pizzuto's assertion that the attorney representing him during his previous *Atkins* proceedings was negligent for failing to fully develop the record regarding Pizzuto's alleged intellectual disability. The district court determined Pizzuto was "not prevented a meaningful opportunity to present his claim due to the lack of representation," nor did Pizzuto experience a "complete absence of meaningful representation." Thus, the district court rejected Pizzuto's argument.

During the course of the proceedings pertaining to his fifth petition for post-conviction relief, Pizzuto filed a motion with the district court seeking to be transported to a medical facility for additional testing relating to his alleged intellectual disability. *Pizzuto 2008*, 146 Idaho at 733, 202 P.3d at 655. Pizzuto's attorney, however, did not file a notice to set a hearing on the motion. *Id.* Pizzuto contends his attorney's failure to notice the motion for a hearing constitutes unique and compelling circumstances, and the district court erred in ruling otherwise. We disagree.

In 2008, this Court scrutinized Pizzuto's attorney's alleged negligence, albeit it in a different context. *Id.* at 734–35, 202 P.3d at 656–57. More specifically, this Court addressed whether the district court erred when it dismissed Pizzuto's fifth petition for post-conviction relief without additional testing. *Id.* This Court observed that Pizzuto was aware the district court had not yet ruled on his motion for additional testing when he filed his motion for summary judgment in 2005. *See id.* Nevertheless, Pizzuto did not ask the district court to rule on his motion for additional testing at that time. *Id.* at 734, 202 P.3d at 656. Rather, Pizzuto proceeded with his motion for summary judgment without additional testing knowing the district court could deny his motion for summary judgment or dismiss his successive petition for post-conviction relief altogether. *See id.* Thus, "[h]e asked the district court to refrain from dismissing the petition if the court denied Pizzuto's motion for summary judgment and to give Pizzuto's counsel additional guidance as to what proof was lacking." *Id.* In other words, Pizzuto made a strategic decision to pursue his motion for summary judgment without additional testing, but he

18

wanted to reserve the ability to develop additional evidence regarding his alleged intellectual disability later, if necessary. Notwithstanding Pizzuto's request, the district court denied Pizzuto's motion for summary judgment and dismissed his petition for post-conviction relief. *Id.*

A trial court has broad discretion to grant or deny a motion under Idaho Rule of Civil Procedure 60(b)(6). *Eby*, 148 Idaho at 736, 228 P.3d at 1003. With that said, a motion may be granted only if the movant establishes unique and compelling circumstances justifying relief. *Id.* at 736, 228 P.3d at 1003. When determining whether unique and compelling circumstances exist in a post-conviction case, courts will assess whether there was a complete absence of meaningful representation during the post-conviction proceedings. *Id.* at 737, 228 P.3d at 1004 (stating that the "complete absence of meaningful representation" in a post-conviction case may constitute unique and compelling circumstances).

In *Eby*, the defendant was convicted of first degree murder, conspiracy to commit robbery, and attempted robbery. *Id.* at 732, 228 P.3d at 999. Eby, acting pro se, filed a petition for post-conviction relief. *Id.* at 733, 228 P.3d at 1000. The district court subsequently appointed counsel to represent Eby. *Id.* Eby was represented by a series of four attorneys over the next five years. *Id.* at 733–34, 228 P.3d at 1000–01. The attorneys severely neglected Eby's case, which resulted in the dismissal of his petition for post-conviction relief due to inactivity. *Id.* at 732, 228 P.3d at 999. "After years of shocking and disgraceful neglect of his case by a series of attorneys appointed to represent [Eby], his petition for post-conviction relief was dismissed for inactivity pursuant to I.R.C.P. 40(c)." *Id.*

Because of the shocking neglect described above, this Court concluded that Eby's case may involve the unique and compelling circumstances necessary to grant relief under Idaho Rule of Civil Procedure 60(b)(6):

> We recognize and reiterate today that there is no right to effective assistance of counsel in post-conviction cases. We likewise recognize that "this Court has infrequently found reason to grant relief under I.R.C.P. 60(b)(6)." *Berg v. Kendall*, 147 Idaho 571, 576 n.7, 212 P.3d 1001, 1006 n.7 (2009). However, we are also cognizant that the Uniform Post-Conviction Procedure Act is "the exclusive means for challenging the validity of a conviction or sentence" other than by direct appeal. *Rhoades v. State*, 148 Idaho 215, 217, 220 P.3d 571, 573 (2009) (quoting *Hays v. State*, 132 Idaho 516, 519, 975 P.2d 1181, 1184 (Ct. App. 1999)). Given the unique status of a post-conviction proceeding, and given the *complete absence of meaningful representation* in the only available proceeding for Eby to advance constitutional challenges to his conviction and sentence, we

19

conclude that this case may present the "unique and compelling circumstances" in which I.R.C.P. 60(b)(6) relief may well be warranted.

*Id.* at 737, 228 P.3d at 1004 (emphasis added).

Here, the district court determined that the facts associated with Pizzuto's Motion are "substantially different" from the facts in *Eby*. Unlike the facts in *Eby*, where this Court determined there had been a complete absence of meaningful representation, Pizzuto asserts his attorney was negligent for failing to notice a motion for a hearing. The district court concluded that this strategic decision on the part of Pizzuto's attorney did not equate to a complete absence of meaningful representation:

> Pizzuto has called into question counsel's strategy on how the fifth petition for post-conviction relief was handled. Pizzuto claims that counsel was negligent for failing to adequately develop the factual record with respect to his intellectual disability. The record is clear, however, that Pizzuto was not prevented a meaningful opportunity to present his claim due to the lack of representation. When the fifth petition was considered, counsel and the court did not have the guidance of *Hall*, *Brumfield*, and *Moore I*, as well as the updates to the AAIDD and the American Psychiatric Association clinical standards. This [c]ourt can also look in hindsight and question why counsel did not develop the record regarding the issue of intellectual disability, but the record establishes Pizzuto was represented; he did not experience a complete absence of meaningful representation . . . ."

Rather, the district court determined that the circumstances surrounding Pizzuto's case were more analogous to the facts in *Dixon v. State*, 157 Idaho 582, 338 P.3d 561 (Ct. App. 2014). Unlike the attorneys in *Eby* who egregiously neglected Eby's case, the attorney in *Dixon* presented Dixon's post-conviction claim and actively represented him during his proceedings. *Id.* at 587–88, 338 P.3d at 566–67. Thus, even if Dixon's attorney made some errors, the Court of Appeals reasoned that those errors did not constitute a complete absence of meaningful representation:

> While there may have been a fatal evidentiary gap at the post-conviction trial, Rule 60(b)(6) does not provide an avenue to retry the case or supplement the evidence. The circumstances of Dixon's case do not rise to the level of unique and compelling circumstances, and the district court did not abuse its discretion in denying the Rule 60(b)(6) motion. This is true even if we consider that Dixon's post-conviction counsel failed to present evidence at the post-conviction hearing as to one of the claims.

*Id.* at 588, 338 P.3d at 567.

The district court also relied on *Bias v. State*, 159 Idaho 696, 365 P.3d 1050 (Ct. App. 2015), in its analysis. Bias was dissatisfied with his post-conviction counsel's performance and filed a motion for relief from judgment. *Id.* at 707, 365 P.3d at 1061. The Court of Appeals noted, however, that Bias's post-conviction counsel filed a responsive brief and supporting affidavits in response to the State's motion for summary dismissal. *Id.* "Unlike the petitioner in *Eby*, Bias did not experience a 'complete absence of meaningful representation.' " *Id.* Thus, the Court of Appeals held that Bias's dissatisfaction with his attorney's performance did not constitute unique and compelling circumstances necessary to grant relief under Idaho Rule of Civil Procedure 60(b). *Id.*

The Court of Appeals reached a similar conclusion in *Devan v. State*, where it held that a petitioner's "dissatisfaction with his post-conviction counsel's performance does not constitute the unique and compelling circumstances required before a court may grant relief under I.R.C.P. 60(b)." 162 Idaho 520, 524, 399 P.3d 847, 851 (Ct. App. 2017). "Unlike the petitioner in *Eby*, Devan did not experience a 'complete absence of meaningful representation.' " *Id.*

Based on its analysis, the district court concluded that the issues associated with Pizzuto's Motion are "well distinguishable" from the complete absence of meaningful representation found in *Eby*. Rather, the district court concluded that the issues associated with Pizzuto's Motion are more analogous to the issues in *Dixon*, *Bias*, and *Devan*. Thus, the district court held that "Pizzuto's argument that his case constitutes unique and compelling circumstances based upon his representation fails."

The district court correctly perceived the issue before it as one of discretion, and it acted within the outer boundaries of its discretion. Further, the district court acted consistently with the applicable legal standards. The district court properly identified the applicable legal standards— including Idaho Rule of Civil Procedure 60(b)(6) and relevant case law—and acted in a manner consistent with the standards. Finally, the district court reached its decision by the exercise of reason. First, the district court analyzed Pizzuto's Motion based on *Eby*, *Dixon*, *Bias*, and *Devan*. Next, the district court determined that the facts associated with Pizzuto's Motion are more analogous to the facts in *Dixon*, *Bias*, and *Devan* than to the facts in *Eby*. Consequently, the district court reasoned that Pizzuto did not experience a complete absence of meaningful representation. And finally, because Pizzuto did not experience a complete absence of meaningful representation, the district court reasoned that Pizzuto did not establish unique and

compelling circumstances necessary for relief under Idaho Rule of Civil Procedure 60(b)(6). In short, when the district court concluded that Pizzuto had not established unique and compelling circumstances, it did so by the exercise of reason.

Because there is no abuse of discretion, we hold that the district court did not err when it denied Pizzuto's Motion because he failed to show unique and compelling circumstances.

## IV. CONCLUSION

In light of the foregoing, we affirm the district court's decision denying Pizzuto's Motion.

Chief Justice BEVAN, Justices BURDICK, STEGNER, and MOELLER CONCUR.